**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CARRIE WARFIELD, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 05 C 3712 |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Judge Castillo |
| | ) | |
| Defendants. | ) | Magistrate Judge Cole |

**DEFENDANTS' L.R. 56.1(a)(3) STATEMENT OF
MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT**

Defendants Calvin Chatman, Dwayne Collier, Raymond Schalk, Jerome Bogucki, Valerie Lymperis, Antonio Allen, Michael Muzupappa, John Hillmann, Bruce Kischner, and Alan Pergande (collectively the "Police Officer Defendants") and the City of Chicago, by their undersigned attorneys, and pursuant to Local Rule 56.1(a)(3), hereby submit this statement of material facts in support of their motion for summary judgment.

**Parties**

1.      Plaintiffs are all residents of the City of Chicago. On June 27, 2004, Carrie "Crystal" Warfield, her sister Lagina Warfield, Lagina's son Deshaun Fox, and their cousin Jennifer Warfield were living in Crystal's apartment at 5331 W. Congress Parkway, in Chicago. Jalessa Bonner was staying with her aunt, Mary Bonner, in an apartment at 5508 W. Congress Parkway, in Chicago. Latoya "Angel" Powell lived at 5234 W. Harrison. (Ex. 1: Third Amended Complaint, ¶ 4; Ex. 2: Dep. of C. Warfield, pp. 8:19-23, 23:1-8; Ex. 3: Dep. of J. Warfield, 11:7-8, 16-22, 23:16-22; Ex. 4: Dep. of J. Bonner, pp. 8:19-24, 9:1-19; Ex. 5: Dep. of M. Bonner, p. 26:3-9; Ex. 6: Dep. of L. Powell, pp. 4:14-20, 18:14, 21, 19:4-5).

2.      In June of 2004, Chicago Police Officers Calvin Chatman and Dwayne Collier were assigned to the 15th District gang team. (Ex. 7: Dep. of C. Chatman, pp. 13:17-20, 17:17-21; Ex. 8: Dep. of D. Collier, pp. 16:17-19, 17:1-2, 15-17, 18:4-5).

3.      In June of 2004, Detectives Raymond Schalk and Jerome Bogucki were partners assigned to the Area 5 violent crimes unit, primarily working on homicides. (Ex. 9: Dep. of R. Schalk, pp. 6:6-13, 7:6-10; Ex. 10: Dep. of J. Bogucki, pp. 6:5-11, 7:3-8, 20-22, 9:11-12, 20-24, 10:1-2).

4.      In June of 2004, Chicago Police Detective John Hillmann was assigned to the Area 5 robbery-burglary-theft division.  Detective Valerie Lymperis was a Youth Investigator at Area 5. Detective Alan Pergande was assigned to the violent crimes section at Area 5. Detective Michael Muzupappa was assigned to Area 5. (Ex. 11: Dep. of Hillmann, pp. 8:17-21, 29:20-24; Ex. 12: Dep. of Lymperis, pp. 6:24, 7:1, 14:7-14; Ex. 13: Dep. of Pergande, pp. 8:6-8, 12:18-24, 13:1,16:20-24, 17:1-8; Ex. 14: Dep. of Muzupappa, pp. 33:21-23, 37:1-6).

5.      Detective Antonio Allen was a Detective assigned to Area 4 and primarily worked on aggravated battery cases. Detective Bruce Kischner was assigned to Area 5 and primarily worked on robbery cases. (Ex. 15: Affidavit of Antonio Allen, ¶ 1; Ex. 16: Affidavit of Bruce Kischner, ¶ 1).

### Jurisdiction

6.      Plaintiffs' action is brought pursuant to 42 U.S.C. Section 1983 and Illinois law. (Ex.1: Third Amended Complaint, ¶ 1).

7.      Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1367. (Ex.1: Third Amended Complaint, ¶ 2).

8.      Venue is proper under 28 U.S.C. § 1391. (Ex. 1: Third Amended Complaint, ¶ 3).

### The Earlier Shooting and Subsequent Surveillance

9.      On June 27, 2004, at approximately 7:35 p.m., a shooting occurred on the 5300 block of West Congress. Sergeant Robert Rentner, of the 15th District gang tactical team, sent officers to the scene to determine if it was gang related. The officers reported back to Sgt. Rentner that the shooting was gang related and part of ongoing internal conflict going on in the street gang that runs the narcotics on that block. (Ex. 17: Dep. of R. Rentner, pp. 15:1-10, 42:3-4, 43:2-19, 24, 44:1-3; Ex. 18: Supplementary Report dated April 5, 2005).

10.      Sgt. Rentner received information that there was a vehicle, a red Chevy, on the 5300 block of W. Congress that may have a cache of weapons. Sgt. Rentner assigned Officers Chatman and Collier to the location in a covert van. Officers Collier and Chatman were dressed in civilian dress. Officers Collier and Chatman were assigned to conduct surveillance of the red Chevy. Officers Chatman and Collier learned before leaving the station that the earlier shooting was gang related as one of the individuals involved in the earlier shooting, Shaun Wooden, was a high ranking gang figure in that area. (Ex. 17: Dep. of R. Rentner, p. 44:6-17; Ex. 7: Dep. of Chatman, pp. 62:20-24, 63:1-13, 66:2-8).

11.      Officer Chatman was driving the covert van. He parked the van at approximately 5310 W. Congress. The officers identified the red Chevy and remained in the front seat of the van to conduct their surveillance. A beat car was present at the intersection of Lockwood and Congress, parked at the circular mound at the corner. While Chatman and Collier were conducting their surveillance, Officer Collier received a phone call from his then-fiancee. (Ex. 7: Dep. of Chatman, pp. 44:12-13, 67:1-3, 16-17, 19-24, 68:2-6, 71:6-8, 75:19-24, 76:1).

**Seneca Smith Pulls A Gun On the Police Officers in the Van**

12.     Meanwhile, Officer Chatman observed a group of several young black males standing approximately six to seven houses to the west of the van, on the north side of the street in the sidewalk area. One male, approximately 14 to 16 years of age, walked east on Congress on the north side of the street, stopped approximately one house west of the Officers' location, crossed his arms and gazed at the Officers for approximately 35 to 40 seconds. The male went back to the other young, black males and began to gesture in a very demonstrative way, and at one point turning toward the van location and pointing directly at the Officers. (Ex. 7: Dep. of Chatman, pp. 77:3-11, 80:21-24, 81:1-5, 83:14-19).

13.     Kejuan Harper, who lived at 5330 W. Congress, testified that at that time he was standing in a group outside his house with his friends Mandrell Brady, Arnold Barnes, his cousin Deandre Lee, Darryl McCord, and his brother Jabar.  He testified that Seneca Smith walked up to the group as did another person from the neighborhood named Jamal.  Kejuan and Mandrell testified that Seneca walked away from the group headed east towards Lockwood.  (Ex. 19: Dep. of K. Harper, pp. 6:3-4, 56:3-13, 59:12-19, 61:8-11, 16-24, 62:1-5, 64:2-11, 66:1-12, 71:12-14, 74:3-16; Ex. 20: Dep. of M. Brady, pp. 32:24, 33:1-15, 35:21-24, 36:13-19, 38:1-12).

14.     Two to three seconds after the 14 to 16 year old returned to the group, an individual emerged from the group wearing blue-jean shorts, a baby-blue and white North Carolina basketball jersey with a braid hairstyle.  The individual, Seneca Smith, had his right hand underneath the jersey at his belt-waist area.  He kept his hand in the same location as he walked east on Congress on the north side of the street. Smith continued walking until he got to approximately one house west of the van's location, and then he began to jog or run directly toward the passenger-side door of the van.

(Ex. 7: Dep. of Chatman, pp. 84:2-8, 14-24, 85:3-8).

15.     As he observed Smith approach, Officer Chatman removed his weapon from his holster and lowered it along the side of his seat, he also removed his badge from underneath his jersey and draped it on his chest.   Officer Collier remained on his cell phone.   When Smith approached the van's passenger-side door, Officer Chatman observed Smith look east toward Lockwood where the beat car was located and back at the Officers. Officers Chatman and Collier heard him say something to the effect of "what you motherfuckers want, what you all doing over here." Officer Chatman identified himself as the police by saying "relax, man, we're the police" and he reached for his badge to turn toward him.  (Ex. 7: Dep. of Chatman, pp. 86:10-14, 87:14-24, 88:1-2; Ex. 8: Dep. of Collier, p. 49:1-3, 9-13).

16.     Officer Chatman observed Smith look one last time toward the beat car and both officers heard him say "fuck that." At that point Officer Chatman saw the weapon come up in his right hand at a 45 degree angle toward the right side of Officer Collier's head. Officer Collier dropped his cell phone. Officer Chatman then fired twice at Smith across Officer Collier's chest area. (Ex. 7: Dep. of Chatman, p. 88:3-9; Ex. 8: Dep. of Collier, p. 49:7-8, 12-15; Ex. 21: Defendants' Requests to Admit, ¶ 20).

17.     Smith fell to the ground and immediately got up and began running westbound on Congress. When Smith started to run Officer Collier saw the gun in his hand. Officer Collier gave chase and ran westbound down the sidewalk. He announced his office by saying "police."  Officer Chatman gave chase parallel to Smith and Officer Collier. Officers Collier and Chatman had their badges visible as they chased Smith. (Ex. 8: Dep. of Collier, pp. 58:3-5, 18-20, 61:22-24, 62:20-23, 63:10-14; Ex. 7: Dep. of Chatman, p. 98:5-10; Ex. 22: Dep. of D. Wooden, p. 141:10-20; Ex. 23:

Dep. of J. Blakes, pp. 17:2-19, 20:8-14, 22:3-13).

### The Chase Ends at 5331 W. Congress

18.     After about three or four houses from the location of the van, Smith's route changed

as he made a 45 degree angle and crossed into the street. Smith then turned slightly to his left and

fired his weapon in Officer Collier's direction. In response, Officer Collier then fired two shots in

Smith's direction. Throughout the chase, Officer Collier continued to announce his office and

ordering Smith to stop. (Ex. 8: Dep. of Collier, pp. 64:6-11, 65:1-3, 12-13, 66:14-15, 72:8-9; Ex. 7:

Dep. of Chatman, pp. 98:21-24, 99:1-7, 19-24, 102:13-24, 103:1-10; Ex. 21: Defendants' Requests

to Admit, ¶ 21).

19.     Smith continued running and when he reached the door at 5331 W. Congress, he

again pointed his weapon at Officer Collier while attempting to force the door open.  Officer Collier

had taken cover behind a tree in the parkway in front of the house next to 5331 to the left.  When

Smith raised his weapon toward Collier, Officer Collier aimed his weapon at Smith and fired twice.

At that time, the outside door opened up and Smith fell inside the hallway.  Collier did not fire a

third time because the hallway was dark and Officer Collier could not see inside of it and he no

longer felt a threat from Smith.  While chasing Smith, Officer Collier did not see a group of girls or

hear anyone calling to Smith.  At the time Officer Collier was firing at Smith, Officer Chatman did

not see or hear anyone immediately behind the door that Smith was trying to force open. Officers

Collier and Chatman never entered the basement apartment. The shooting occurred at approximately

10:39 p.m. (Ex. 8: Dep. of Collier, pp. 69:9, 12-13, 73:1-8, 76:21-24, 77:1-9, 78:9-15, 80:21-23,

81:12-15, 88:10-14, 93:5-8; Ex. 7: Dep. of Chatman, pp. 103:21-24, 104:1-4, 108:5-11, 114:8-14;

Ex. 21: Defendants' Requests to Admit, ¶ 22; Ex. 24: Chicago Police Department Event Query for

Event # 0417923110).

20.     Just prior to the shooting involving Smith, Plaintiffs Crystal, Jennifer, Angel, Mary, Jalessa and their friends Chantel Davidson and Katrina Robinson were walking from a store at Harrison and Lotus towards Crystal's apartment. They were walking eastbound on Congress, on the south side of the street. As they were walking, they saw Seneca Smith walking in the same direction on the opposite side of the street. Seneca and Crystal were talking back and forth. (Ex. 2: Dep. of C. Warfield, pp. 44:21-22, 45:22-24, 46:1, 49:4-6 ,13-15, 50:14-15, 55:1-9; Ex. 3: Dep. of J. Warfield, pp. 38:14-22, 39:5-8; Ex. 4: Dep. of J. Bonner, pp. 85:1-5, 86:4-11, 88:2-4, 24, 89:1-13, 90:4-13; Ex. 5: Dep. of M. Bonner, pp. 56:19-24, 60:12-24, 64:17-24, 65:1-5, 10-18)

21.     The girls knew Seneca as someone from the neighborhood. Deshaun Fox knew Seneca as a friend of his mom's. Seneca had come to Deshaun's house a few times before to visit his mom and his Aunt Crystal. Seneca was friends with his mom and Crystal. Seneca's girlfriend Vita was also friends with his mother and Deshaun has been to Seneca's house. (Ex. 2: Dep. of C. Warfield, p. 36:14-17; Ex. 3: Dep. of J. Warfield, p. 32:1-10; Ex. 5: Dep. of M. Bonner, pp. 61:23-24, 62:1-9; Ex. 4: Dep. of J. Bonner, p. 45:9-22; Ex. 25: Dep. of D. Fox, pp. 31:14-24, 32:1-22, 33:1-7, 15-16, 34:2-10)

22.     As they approached the entrance to Crystal's apartment building, the girls heard gunshots. The girls ran into the hallway of the building and shut the door. It was dark in the hallway. They could not get down to Crystal's apartment and were banging on the door. Seneca ran up to the outside door and pushed his way in. When Seneca was in the hallway of the building he was standing in the middle of the glass door. Seneca was real big. (Ex. 4: Dep. of J. Bonner, pp. 92:8-18, 100:20-24, 101:1-7, 104:1-23, 105:18-21; Ex. 2: Dep. of C. Warfield, pp. 70:19-24, 71:1-2, 73:1-5, 19-24,

78:7-10, 79:19-24; Ex. 3: Dep. of J. Warfield, pp. 42:8-12, 20-24, 43:1-10, 52:5-24, 53:1,163:6-10;

Ex. 5: Dep. of M. Bonner, pp. 79:17-24, 80:1-4; Ex. 6: Dep. of L. Powell, p. 185:3-7)

23. When they heard the gunshots coming toward the hallway, the girls placed themselves up against the walls of the hallway to avoid the gunshots. Some of the girls testified that Seneca pushed them out of the way so that they would not be hit by the gunfire. The girls testified that at one point, Crystal yelled, "you shot my baby," and the girls heard the shooters run away. The basement door opened and the girls ran downstairs and Crystal and Angel pulled Seneca downstairs with them. Crystal testified that she could not leave Seneca there when he had saved them and taken bullets for the girls. Once inside, Crystal called the police. (Ex. 4: Dep. of J. Bonner, pp. 103:1-9,110:17-20, 112:21-24, 113:1-4, 12-14; Ex. 2: Dep. of C. Warfield, pp. 80:1-7, 82:18-22, 85:17-24, 210:14-20; Ex. 3: Dep. of J. Warfield, pp. 53:4-16, 63:3-8, 64:3-12, 66:5-8, 163:6-10; Ex. 5: Dep. of M. Bonner, pp. 80:8-11, 86:19-22; Ex. 6: Dep. of L. Powell, p. 52:1-9).

### In the Basement

24. Lagina was asleep in the back of the apartment with her son Deshaun when she heard banging on the door. Lagina heard Crystal's voice yelling as she heard banging on the door. Lagina heard three gunshots as she approached the bottom of the stairs. Lagina unlocked the door of the apartment and ran to the bed to cover her son. Lagina then walked to the front of the apartment where Crystal and the others were standing. She saw Seneca on the floor of the stairs. (Ex. 26: Dep. of L. Warfield, pp. 73:20-22, 75:3-8, 76:10-13, 77:3-6, 21-24, 78:1-4, 80:22-24, 81:12-16, 22-24, 82:1, 84:1-4, 18-20, 85:1-6)

25. The police came into the basement with their guns drawn and told the girls to sit down. There were numerous police officers in uniform and in plain clothes. Officers handcuffed

Seneca. Female officers arrived and searched the girls individually. (Ex. 3: Dep. of J. Warfield, pp. 66:7-8, 19-21, 73:7-11, 74:4-12; Ex. 26: Dep. of L. Warfield, pp. 87:12-14, 89:9-12; Ex. 4: Dep. of J. Bonner, pp. 117:2-24, 118:1, 13-15, 122:7-8, 123:4-11; Ex. 5: Dep. of M. Bonner, p. 99:9-20; Ex. 6: Dep. of L. Powell, pp. 57:23-24, 58:12-24, 59:3-15)

26.     Jalessa testified that she was asked by the female officer to unbutton her jumper and the officer felt under her bra and lifted her bra up and she put her hands down around Jalessa's waist. There were male officers standing on the side while she had her shirt open. Jalessa was then told to button her jumper and she was patted down. The search took about two minutes. (Ex. 4: Dep. of J. Bonner, pp. 124:7-12, 125:21-23, 126:2-4, 10-24, 127:4-16)

27.     Defendant Lymperis was not the female officer that searched Jalessa Bonner. (Ex. 12: Dep. of V. Lymperis, p. 14:4-9; Ex. 21: Defendants' Requests to Admit, ¶ 35)

28.     Ambulances came to take Chantel Davidson and Seneca Smith to the hospital. (Ex. 17: Dep. of R. Rentner, pp. 84:9-13, 88:7-13).

29.     A police officer wearing a "white shirt" told the girls that they had to go to the station for questioning. (Ex. 4: Dep. of J. Bonner, pp. 130:3-10; Ex. 5: Dep. of M. Bonner, p. 106:1-12; Ex. 6: Dep. of L. Powell, pp. 64:19-24, 65:1-18).

30.     Jalessa, Mary, and Jennifer told the police that they did not want to go, and the officers said you have to go to the station. Lagina kept asking the police, "For what? Why are we going?" And the police said for questioning. (Ex. 4: Dep. of J. Bonner, p. 131:9-23; Ex. 5: Dep. of M. Bonner, p. 110:20-24, 111:3-4; Ex. 3: Dep. of J. Warfield, p. 69:6-10; Ex. 26: Dep. of L. Warfield, p. 93:21-24).

31.    Before the girls left for the station, a police officer requested that Crystal sign a paper to allow them to search her house for weapons. Crystal agreed and signed the paper. The paper Crystal signed was a Consent to Search form. (Ex. 2: Dep. of C. Warfield, p. 97:1-14; Ex. 27: Consent to Search form).

32.    The girls were not handcuffed at any time. (Ex. 2: Dep. of C. Warfield, p. 207:1-4; Ex. 3: Dep. of J. Warfield, pp. 69:4-5, 92:10-11; Ex. 5: Dep. of M. Bonner, pp. 111:5-6, 113:19-20; Ex. 4: Dep. of J. Bonner, p. 190:19-24; Ex. 21: Defendants' Requests to Admit, ¶ 26-32).

33.    At approximately midnight Crystal, Jennifer, Lagina, Deshaun, Angel, Mary and Jalessa as well as Katrina Robinson, Dora Wooden and Jerry Blakes had all arrived at the Area. They were all brought to the second floor of Area 5 to be interviewed regarding what they saw and heard in connection with the shooting. (Ex. 26: Dep. of L. Warfield, pp. 105:1-2, 22-24, 106:1-2; Ex. 5: Dep. of M. Bonner, pp. 110:2-6, 115:5-7; Ex. 4: Dep. of J. Bonner, pp. 138:21-24, 139:19-24,140:1-12; Ex. 3: Dep. of J. Warfield, pp. 70:20-24, 74:16-22, 75:3-9; Ex. 6: Dep. of L. Powell, pp. 63:16-24, 64:1-2, 68:13-15; Ex. 16: Affidavit of Bruce Kischner, ¶ 4).

## Police Investigation

34.    Detective Hillmann was informed of the shooting involving Seneca Smith at around 11:00 p.m., when he was somewhere in the Area, and he was asked to remain in the Area. Detective Lymperis was in the Special Victims Unit (SVU) office at Area 5 when she first heard about the Seneca Smith shooting and she was asked to wait and see if she could help as needed. Detective Pergande learned of the Seneca Smith shooting and was instructed to remain at Area 5 and did not go to the crime scene. Detective Muzupappa was at Area 5 when he was informed of the shooting and asked to wait in the Area, he did not go to the scene of the Seneca Smith shooting. Detective

Kischner was in Area 5 at the time of shooting and was asked to wait in the Area to assist with interviewing witnesses. Detective Allen was at Area 4 when he was assigned to assist in the investigation and went to the scene. (Ex. 11: Dep. of Hillmann, pp. 8:17-21, 29:20-24, 30:17-23; Ex. 12: Dep. of Lymperis, pp. 6:24, 7:1, 14:7-14, 15:22-24, 16:1; Ex.13 : Dep. of Pergande, pp. 8:6-8, 12:18-24, 13:1,16:20-24, 17:1-8; Ex. 14: Dep. of Muzupappa, pp. 33:21-23, 37:1-6; Ex. 16: Affidavit of Bruce Kischner, ¶¶ 2, 3; Ex. 15: Affidavit of Antonio Allen, ¶¶ 2, 3).

35.     Detective Lymperis was advised that the girls were witnesses to a shooting, and was asked to interview them.  Detective Lymperis interviewed Mary Bonner in the SVU office.  Mary was not read her Miranda rights. Mary did not ask to make a phone call during her interview. Detective Lymperis sat in on an interview with Jalessa Bonner. (Ex. 12: Dep. of Lymperis, pp.19:1-3, 21:13-15, 23:10-11, 36:18-20, 54:5-8).

36.     Detective Lymperis was in the SVU office with Mary and Jalessa and some of the other girls, a total of 5 or 6. She brought the girls something to drink and some snacks.  None of the girls that were sitting in the office asked to use the phone.  Prior to the girls being brought to the SVU office, Detective Lymperis had observed them laughing and joking and they were laughing and joking inside the SVU office as well.  Detective Lymperis directed the girls to the bathroom, but did not walk them to the bathroom.  None of the girls asked Detective Lymperis if they could leave. (Ex. 12: Dep. of Lymperis, pp. 51:7-20, 54:5-8, 59:9-14, 60:10-16, 64:15-17, 65:8-20, 66:13-15).

37.     Detective Lymperis conducted a second interview of Mary Bonner and Jalessa Bonner at around 5:00 a.m. because there was new information that one of the girls in the vestibule saw a gun. Mary and Jalessa maintained they did not see a gun. (Ex. 12: Dep. of Lymperis, pp. 42:22-24, 43:1-4, 68:2-6, 69:7-19, 70:6-10, 71:21-25, 72:12-14).

38.     Detective Muzupappa observed that at one point the girls were escorted into a smaller office because they were joking and loud and there were a lot of police personnel coming through the area they were in. The girls were brought drinks and food. Detective Muzupappa interviewed Katrina Robinson and Lagina Warfield twice. Lagina Warfield said she would be willing to remain at the station when asked by Detective Muzupappa. Lagina maintained throughout both interviews that she did not see Seneca with a gun. (Ex. 14: Dep. of Muzupappa, pp. 41:4-7, 48:15-17, 61:15-18, 62:2-8, 11-12, 78:17-20, 85:13-16, 88:5-9, 97:7-11).

39.     After Detective Hillmann's first interview of Jennifer Warfield, he asked her if she could stay and that he would like her to stay a little bit longer in case any of the other questions came up during the investigation.  Jennifer said okay.  Detective Hillmann never read Jennifer her Miranda rights. Detective Hillmann escorted Jennifer to the bathroom on at least one occasion. Detective Hillmann observed the girls laughing and carrying on with each other in a playful manner when they were seated together. Detective Hillmann conducted the second interview of Jennifer. She maintained she did not see Seneca with a gun. (Ex. 11: Dep of Hillmann, pp. 33:14-23, 41:8-24, 42:1-8, 46:24, 47:1-2, 63:2-15, 74:4-11).

40.     Detective Pergande interviewed Crystal Warfield twice. Detective Pergande told Crystal that these things take a while and he asked Crystal if she would mind staying and she said she would stay. Crystal maintained throughout both interviews that she did not see Seneca with a gun. Detective Pergande and the other officers saw to the witnesses and tried to keep them comfortable by taking the witnesses to the bathroom, got them something to drink, and  got them snacks.  The witnesses acted in a normal demeanor and there was some laughing, joking between the witnesses. (Ex. 13: Dep. of Pergande, pp. 18:13-19, 43:7-11, 45:2-24, 47:10-22, 53:7-21).

41.     While at the scene of the shooting, Detective Allen was asked to drive witnesses Jalessa Bonner and Mary Bonner to Area 5 to be interviewed. Jalessa and Mary were not under arrest, they were not handcuffed, and they were not given Miranda warnings. Jalessa and Mary did not tell Detective Allen that they did not want to go to Area 5. Detective Allen conducted the initial interview of Jalessa at Area 5.  Jalessa told Detective Allen that she did not see Seneca with a gun. Detective Kischner interviewed Latoya "Angel" Powell twice at Area 5. Latoya was not read Miranda warnings.  Latoya was cooperative and did not say that she wanted to leave. During both interviews, Latoya did not say anything about seeing Seneca with a gun.  (Ex. 15: Affidavit of Antonio Allen, ¶¶ 4, 5; Ex. 16: Affidavit of Bruce Kischner, ¶¶ 5, 6, 8).

42.     Detectives Schalk and Bogucki were assigned to investigate the Seneca Smith shooting at approximately 11:00 p.m.   When the Detectives arrived at the scene, there were numerous 15th District officers there and the street was blocked off,  not allowing the traffic to come through.  Detective Schalk learned that the Shaun Wooden shooting had occurred at approximately 7:30 that evening.  Det. Schalk asked if there were any witnesses to the shooting, and learned that there had been some girls in the building at 5331 W. Congress who were going to be taken in to Area 5. Det. Schalk did not search the scene or interview the people who had been in the building, or speak to any non-police witnesses at the scene. (Ex. 9: Dep. of R. Schalk, pp. 9:3-18, 10:22-23, 14:19-22, 16:5-6, 17:17-22, 22:4-17, 45:21-24, 84:1-4; Ex. 10: Dep. of J. Bogucki, pp. 16:17-24, 19:19-21).

43.     After one to two hours at the scene, Detectives Schalk and Bogucki entered the building at 5331 W. Congress. The vestibule had an outside door with glass in it. There was a pair of bullet holes in the glass on the outside door, and some shattered glass lying on the inside of the

vestibule. There were two doors which open into the vestibule, one which leads down into a basement apartment, and one which leads to the residence above. When the Detectives entered the building, there were no civilians present. When the Detectives were in the apartment there were no police officers searching the apartment, Detective Bogucki noted evidence of searching in the basement apartment. The Detectives left the scene at approximately 2:00 a.m. (Ex. 9: Dep. of R. Schalk, pp. 76:2-10, 79:3-12, 81:11-23; Ex. 10: Dep. of J. Bogucki, pp. 80:14-22, 81:20-21, 84:17-20).

44.     Area 5 is located on the second floor of the 25th District. There is a large outer office area, interview rooms and smaller offices. The interview rooms are approximately eight by ten. There's a metal bench and a door with glass in it. Sometimes chairs are brought into the room. Upon arriving at Area 5, Detectives Schalk and Bogucki learned that there were a number of witnesses that had been spoken to, and three witnesses that had not yet been spoken to – Jerry Blakes, Dora Wooden, and John Redd. Detectives Schalk and Bogucki interviewed those three witnesses. Before interviewing these witnesses, Detectives Schalk and Bogucki spoke with the detectives that had interviewed the other witnesses to get a general idea of what each witness was saying. To Detectives Schalk and Bogucki's knowledge, no witnesses were locked in any rooms that night. (Ex. 10: Dep. of J. Bogucki, pp. 86:10-21, 90:18-21, 146:24, 147:1-2; Ex. 9: Dep. of R. Schalk, pp. 10:2-6, 84:5-11, 86:12-17, 87:7-12, 98:2-7).

45.     Detective Bogucki learned information that Chantel Davidson, the friend of the Plaintiffs that was taken to the hospital, had made an oral statement to police that Seneca had a gun as he approached the front door of 5331 W. Congress. Bogucki further learned that a state's attorney was called to the hospital in order to take Chantel's statement. Detectives returned to Area 5 with

-14-

Chantel's written statement at approximately 5:00 a.m. Detective Bogucki asked the other detectives to re-interview the girls based on the content of Chantel's written statement as the other girls denied seeing Seneca with a gun. Earlier in the evening the Detectives learned that Chantel would be giving a statement, and they were waiting for the results of that statement to further question the witnesses. (Ex. 10: Dep. of J. Bogucki, pp. 93:11-24, 94:4-13, 95:16-24).

46.     At approximately 4:00 a.m., Detectives Schalk and Bogucki spoke with the girls to ask if they could stay a little longer. The girls asked how long it was going to take, and the detectives told them it would probably take another couple of hours, but that the police needed them to stay. The Detectives related to the girls that they knew that the girls had been there a long time, but they also knew that these things take a long time. The Detectives told the girls they would get them out as quickly as possible if they could still stick around. The girls agreed to stay. None of the girls said anything to Detectives Schalk and Bogucki about having to work. None of the girls told Detectives Schalk and Bogucki that she was pregnant, or asked to call her mother or grandmother. The girls were cooperative and willing to remain. Detective Bogucki had previously observed the girls laughing and joking and did not observe any problems. (Ex. 10: Dep. of J. Bogucki, pp. 92:15-20, 126:16-24, 127:1-7, 132:4-7; Ex. 9: Dep. of R. Schalk, pp. 114:7-15, 22-24, 115:1-12, 116:16-24, 117:1-3).

47.     One of the witnesses at the police station, Jerry Blakes, told an officer that he had to leave because he had to go to work. He was asked to wait until someone became available to drive him, and then he was driven home by a police officer. (Ex. 23: Dep. of J. Blakes 37:5-11, 38:4-22; Ex. 9: Dep. of R. Shalk, p. 15:13-15).

48.     Another witness, Dora Wooden, asked police if she and the girls could go as they had been there for hours and had answered their questions. Dora is the mother of Shaun Wooden, the victim of the earlier shooting which occurred on the 5300 block of W. Congress.  Dora asked if they were under arrest and the officer told her she was not. Dora said if she was not under arrest, then she and the girls could leave. The officer said they needed to wait because two law office departments had to come and ask questions too, the state's attorney and another department. Dora said okay and waited. (Ex. 22: Dep. of D. Wooden, pp. 32:12-18, 108:21-24, 109:1-23).

49.     A round table meeting was convened on June 28, 2004 regarding the Smith shooting. The round table meeting is a police department investigation, the purpose is for a number of people to hear about a case at one time, whether they are from OPS or the Chicago Police Department. A state's attorney is also present.  Detective Schalk presented the witnesses to be interviewed at the round table. The round table investigation finished at approximately 7:30 a.m. All of the witnesses were gone by 8:00 a.m. on June 28, 2004. (Ex. 10: Dep. of J. Bogucki, pp. 120:17-24, 121:1-2, 106:8-11, 107:9-11; Ex. 9: Dep. of R. Schalk, pp. 104:22-24, 105:4-6).

50.     When the girls went home, Detective Bogucki told them something to the effect of thanking them for their time and telling that they were no longer needed for the night. The girls were in the SVU office at the time, all the girls except Katrina Robinson who was speaking to the state's attorney. None of the persons present at Area 5 in the early morning hours of June 28, 2004 were under arrest in relation to the Smith shooting. (Ex. 10: Dep. of J. Bogucki, p. 136:15-18, 24, 137:1-2, 12-18; Ex. 16: Affidavit of Bruce Kischner, ¶ 10).

51.     Police officers recovered a gun from the 5300 block of West Congress on June 28, 2004 at approximately 6:30 a.m., and the gun is believed to be the one that was used by Smith.

Detective Bogucki subsequently learned was a shell caseing found in the middle of the street, at approximately 5324 W. Congress, which was a ballistics match to the gun that was found by police. The casing was found in close proximity to the area where Smith fired at Officer Collier. Detective Bogucki learned of the ballistics evidence approximately 1-2 weeks after the incident when the crime lab finished their examination. (Ex. 10: Dep. of J. Bogucki, p. 54:1-23).

## Plaintiffs' Claim That They Were "Detained"

### Jalessa Bonner

52.     Jalessa testified that at the station she was told by a police officer to come into a room. She testified that the police officer asked her what happened and he wrote down what she said. Jalessa testified that the officer was nice to her. She testified that then a state's attorney walked in and asked the same thing the officer asked her. She wrote down what Jalessa had to say. Jalessa testified that she stayed in the room for another five minutes after they finished talking to her, and then she went back to the open part to sit down. (Ex. 4: Dep. of J. Bonner, pp. 141:11-22, 142:4-14, 23-24, 143:1, 10-21, 144:12-24, 145:1-2).

53.     Jalessa testified that at one point she heard Mary and Angel in a room saying they had to use the washroom. Jalessa testified that she saw Mary and Angel walk out of the room and go to the bathroom and Jalessa went into the room they had been in to take a cigarette break. Mary and Angel smoked in the room with Jalessa. (Ex. 4: Dep. of J. Bonner, pp. 147:10-20, 148:2-22, 154:15-19).

54.     Jalessa testified that she did not talk to any other police officers that night and was never locked in a room. While at the station, Jalessa had some pop to drink and was allowed to use the bathroom. Jalessa went home around 7:00 in the morning when the police officers got done

-17-

talking to everybody. Mary and Jalessa were driven home. (Ex. 4: Dep. of J. Bonner, pp. 155:7-24, 156:1-9, 20-24, 157:1).

55. Jalessa testified that the following day, the police came to her house and spoke to her grandmother. Her grandmother told Jalessa that the police needed her to come back down to the police station. Jalessa testified that she and Mary were driven back to the same police station and questioned again about what had happened. Then they were driven home. Jalessa testified that she has not talked to any other police officers about this incident. (Ex. 4: Dep. of J. Bonner, pp. 158:9-24, 159:1-3, 163:1-10, 164:1-6, 14-18, 170:16-18).

**Mary Bonner**

56. Mary testified that after about 20 minutes at the station, an officer came to her and told her that somebody else was going to come and ask her some questions. When it was her time to be questioned, Mary was taken into a room with a desk, computer and two chairs. Mary testified that she was alone in the room for about 15 minutes until a woman walked in. She explained to Mary that she was going to ask her about what happened and was going to write it on paper. (Ex. 5: Dep. of M. Bonner, pp. 119:10-15, 120:19-22, 123:4-8, 123:9-16, 124:7-12).

57. Mary testified that the woman was just about writing it all down as Mary was talking. She testified that the woman was nice to her. The woman asked if Mary saw a gun at all with Seneca, on him, or near him, and Mary said no. Mary testified that the woman said nothing after that. After Mary spoke with the woman, she was escorted to a desk out in the open area and sat there for a long time. Mary was given a pop to drink. She was not given anything to eat or any chips. Mary did not ask for anything to eat. (Ex. 5: Dep. of M. Bonner, pp. 125:4-6, 126:4-15, 17-20, 127:5-7, 12-13, 134:9-22, 180:22-24).

-18-

58. Mary testified that at one point, an officer came up and put her and Angel in a "cell", a room with a bench and a bar on the wall and a door. They were put in the room together. Mary testified that she and Angel asked the officer, "Why we get put here? Why can't we stay out there? We ain't under arrest." Mary testified that the officer told them, "You better stay there for a while." She further testified that the door of the room was locked. They knocked on the door, but there was no response. They kicked and "bammed" on the door because they had to use the washroom. Mary testified they were in the room for about 40 minutes. (Ex. 5: Dep. of M. Bonner, pp. 135:1-2, 15-24, 136:1-6, 10-18, 137:17-24, 138:1-14, 140:20-24, 141:1).

59. Mary testified that from the time she got to the police station, Mary was saying, "Why is we here? We are not under arrest." Mary testified that she was telling the police, "Why we getting put in cells? We ain't under arrest." Mary testified that after 40 minutes she and Angel were let out of the room and told they could go home now. Mary was taken home by police officers. Mary testified that she and Jalessa were dropped off near their home at around 7:00 in the morning. Other than the female officer, no other police officer talked to Mary the night after the shooting. (Ex.5: Dep. of M. Bonner, pp. 138:15-19, 23-24, 140:13-17, 141:20-24, 142:1, 203:1-8).

60. The next night, a police officer came to Mary's house and spoke with her mom. The officer wanted Mary and Jalessa to come back for questioning. Mary and Jalessa went with the officer back to the same police station. They met with an officer who questioned them again about the same thing. They were at the police station for about two hours. Mary was questioned at a police desk. The officer gave them a business card, and dropped them back off at home. Mary did not speak to any other police officers again. (Ex. 5: Dep. of M. Bonner, pp. 147:2-24, 148:1-4, 8-24, 150:11-18, 151:13-15).

-19-

**Latoya "Angel" Powell**

61.     Angel testified that at the police station she had a seat and 10 or 15 minutes later went into an office. Angel testified she went into the office with two officers who asked her what happened. According to Angel, the officers were talking like Angel had shot Seneca. Angel further testified that the officers told her that they had found the gun and they said that they know Angel and her girls had a gun and they helped Seneca hide the gun. Angel testified that the officers made it seem like Angel shot Seneca and then that she was helping Seneca. (Ex. 6: Dep. of L. Powell, pp. 69:7-16, 70:5-7, 15-18, 72:10-20, 73:2-10, 14-24).

62.     Angel testified that after she talked to the two police officers she went into a room with a bench inside and a window on the door. She was in the room for about 15 or 20 minutes until the officers came and got her for another interview. She testified that the officers asked the same questions and asked where Seneca put the gun. After talking to the police the second time, Angel went back into the room. Angel testified that at some point, she got to banging on the door of the room for about 15 or 20 minutes because she didn't want to be in the room. Angel further testified that they then let her out and she sat with the others girls and police officers out in the open. Angel testified she was given pop to drink. She sat around for hours with the other girls, until they were told they could go home. (Ex. 6: Dep. of L. Powell, pp.77:6-24, 79:1-7,12-24, 80:1-2, 98:13-15, 99:1-9, 101:3-9, 103:1-3, 15-23, 104:5-8, 105:6-11).

63.     Angel testified that at the police station, she said aloud to herself that she wanted to go home in front of the police officer that was interviewing her. The officer did not respond. Angel testified that she did not ask the police officer why he wasn't letting her go and did not tell any other person at the police department that she wanted to go home. Angel could not describe any of the

officers. (Ex. 6: Dep. of L. Powell, pp. 69:19-24, 74:14-16, 215:2-8, 216:2-23).

64.     Angel and Mary both testified that when they were at the police station they heard Dora Wooden, also known as Cookie, tell the girls that they could get a lawsuit against the police and make some money. Angel told Det. Kischner what Dora said. He recorded it on a General Progress Report ("GPR"). He then asked Angel to sign the GPR, which she did. (Ex. 6: Dep. of L. Powell, pp. 91:8-21, 96:14-24, 97-98:1-5; Ex. 5: Dep. of M. Bonner, pp. 143:12-24, 144:1-9; Ex. 16: Affidavit of Bruce Kischner, ¶ 9; Ex. 28: General Progress Report signed by Latoya Powell).

**Carrie "Crystal" Warfield**

65.     Crystal testified that when she first got to the police station they were given chips and pop. At the station, Crystal testified she was interviewed on three separate occasions by different police officers dressed in plain-clothes. First, Crystal testified she was seated at a desk with a detective wearing plain clothes.  The officer ran her name and asked questions about how she knew Seneca and where was Seneca's gun. Crystal testified she was later brought to a room with about six more officers. One officer asked her, "Where's the gun? Did you see a gun? He had a gun?" And stuff like that. (Ex. 2: Dep. of C. Warfield, pp. 113:23-24, 114:1-9, 22-24, 115:1-3, 115:22-24, 116:1-4, 11, 119:14-16, 120:10-13, 121:16-18, 124:11-24, 125:1, 209:16-19).

66.     Crystal testified that she told police what happened when she was questioned by two officers in another room during her third interview. She testified that the officers were getting upset because Crystal kept saying there was no gun. Crystal testified that the officers told her that Lagina had said that Crystal had picked up a gun, and they brought Lagina to the room and Lagina said she didn't recall saying that. Crystal testified that the officer got upset and smacked the back of Crystal's chair with his hand. The officer grabbed Crystal's arm and said you're going to jail. Crystal could

not describe the officer that grabbed her arm, other than to say that he was approximately six foot and had dark hair. (Ex. 2: Dep. of C. Warfield, pp. 122:16-21, 123:11-19, 24, 124:3-7, 125:13-24, 126:1-14).

67.     Crystal testified that the police tried all night to convince her and the other girls to say there was a gun. Crystal testified that after she spoke with the third group of officers, she was locked in a little room until she was "released" the next morning. Crystal testified that she was locked in the room for three hours at the most. She testified that she knocked on the door of that room for three hours, every minute on the minute. (Ex. 2: Dep. of C. Warfield, pp. 136:6-15, 21-23, 137:2, 140:16-21, 141:19-23, 142:12-24, 143:1-5).

68.     Crystal testified that when she was in the room she knocked on the door and said she needed to use the bathroom but no one came to let her out. Crystal never asked to use the bathroom before she was placed in the room. (Ex. 2: Dep. of C. Warfield, pp. 143:12-17, 208:17-21, 209:3-7).

**Lagina Warfield**

69.     Lagina testified that she was taken to a room and questioned by one or two male officers. Lagina cannot describe the officer who questioned her. She testified that the officer asked her if Seneca had a gun and that was basically all they talked about. Lagina then went back out to the chair where her son was sitting. Lagina further testified that later she was questioned by a police officer at a desk in the open area. Lagina was asked for her name and identification. Lagina testified that during her first interview, the police officer called her work and told them she wasn't coming. Lagina could not recall the conversation she had with police about her work. (Ex. 26: Dep. of L. Warfield, pp. 106:16-22, 107:21-23, 109:8-14, 111:1-4, 8-16, 114:8-13, 15-17, 115:5-19, 144:19-22, 145:11-19, 23-24, 146:1).

-22-

70.    Lagina had her cell phone with her and it was never taken away. Lagina testified that she and her son were taken to a room by a police officer and locked in the room alone. She testified that her son needed to use the bathroom so she banged on the door. Lagina further testified that she did not think the door had a knob for her to open the door. Lagina testified that she heard Jennifer saying, "My cousin banging on the door," and then a police officer came to the door and let her son use the bathroom. Lagina and her son then went back to the room. (Ex. 26: Dep. of L. Warfield, pp. 116:19-20, 24, 117:1-2, 121:8-10, 20-22, 122:2-3, 12, 125:2-3, 16-24, 126:13-18, 127:8-10, 15-20).

71.    According to Lagina, an officer came to the room to get her and brought her back to where Crystal and two officers were. The police asked Lagina, "Did Crystal pick up a gun that day?" Lagina said no. According to Lagina, the officer was yelling and banging on Crystal's chair. Lagina got mad and started to cry and then the officer took her back to the room. (Ex. 26: Dep. of L. Warfield, pp. 128:13-16, 24, 129:1-3, 130:11-24, 131:1-3).

72.    When Lagina got back to the room she called her father, her boyfriend, and Channel 5 news. (Ex. 26: Dep. of L. Warfield, p. 131:4-6).

**Deshaun Fox**

73.    Deshaun went to the police station with his mom and Crystal. Deshaun never talked to a police officer and the police didn't ask him any questions. The police gave Deshaun chips and he asked for a Sprite which he got. When Deshaun had to go to the washroom his mom banged on the door. At some point the door opened and Deshaun went to the washroom. (Ex. 25: Dep. of D. Fox, pp. 47:6-8, 48:5-10, 54:5-9, 54:18-24, 55:3-17, 56:4-8, 80:2-4, 11-13, 23-24, 81:1-11).

**Jennifer Warfield**

74.     Jennifer testified that at the station, she was taken to a room by police officers. She testified that they started asking her name and address, then they started saying that she knew where the gun was and that she better tell them that Seneca had a gun or they would lock her up. Jennifer testified that the police officers talked with her for about an hour asking her what he did with the gun, that they would lock her up if she didn't say he had a gun, and saying that Crystal was telling them what to do. (Ex. 3: Dep. of J. Warfield, pp. 75:15-20, 76:5-10, 78:5-19).

75.     Jennifer testified that she was later taken to another room to speak with four or five officers who asked the same thing the other police officers asked her. Jennifer testified that she told them that Seneca did not have a gun when he ran into the building because she did not see him with a gun. Jennifer was then taken to a room and told to stay there by a police officer. Jennifer did not hear the door lock and she never tried to open it. (Ex. 3: Dep. of J. Warfield, pp. 78:22-24, 79:5-13, 80:23-24, 81:1-2, 12-20, 82:18-24, 83:14-19, 92:12-19).

76.     Jennifer testified that she told the police she had to use the bathroom because she was pregnant and they told her no. Jennifer testified that she never got to use the bathroom. She testified that she did not urinate on herself. Jennifer further testified that she fell asleep at one point until some more police officers came in to question her again. They asked the same things. (Ex. 3: Dep. of J. Warfield, p. 84:10-24, 85:1-15).

## Criminal Conviction

77.     Seneca Smith was convicted on October 5, 2007 of two counts of Attempted First Degree Murder and two counts of Aggravated Discharge of a Firearm. (Ex. 29: Certified Statement of Conviction in *People v. Seneca Smith*, Case No. 04 CR 1817101).

Dated: April 1, 2008                         Respectfully submitted,


                                             By:    s/ Eileen E. Rosen
                                                    One of the Police Officers' Attorneys

Eileen E. Rosen
Stacy A. Benjamin
Silvia Mercado Masters
ROCK FUSCO, LLC
321 North Clark Street, Suite 2200
Chicago, Illinois 60610
(312) 494-1000


                                             Respectfully submitted,
                                             MARA S. GEORGES
                                             Corporation Counsel of the City of Chicago


                                             By:      s/ Diane S. Cohen
                                                    Diane S. Cohen
                                                    Assistant Corporation Counsel


Diane S. Cohen
City of Chicago, Law Department
30 North LaSalle Street, 10th Floor
Chicago, IL 60602

## <u>CERTIFICATE OF SERVICE</u>

I, Eileen E. Rosen, one of the attorneys for the defendants, hereby state that I caused a copy of the **Defendants' L.R. 56.1(a)(3) Statement of Material Facts in Support of Summary Judgment**, attached hereto, to be served upon:

Arthur Loevy
Jon Loevy
Michael Kanovitz
Russell Ainsworth
Loevy & Loevy
312 N. May Street, Suite 100
Chicago, IL 60607

via E-FILING on Tuesday, April 1, 2008.

s/ Eileen E. Rosen
Eileen E. Rosen