UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CARRIE WARFIELD, LAGINA WARFIELD, )
individually and on behalf of her minor son, )
DESHAUN FOX, JENNIFER WARFIELD, )
LATOYA POWELL, MARY BONNER, and )
SHERPRINIA BONNER, on behalf of her )
minor daughter JALESSA BONNER, )

          Plaintiffs, )

v. )

CITY OF CHICAGO, OFFICER CALVIN )
CHATMAN, OFFICER DWAYNE COLLIER, )
DETECTIVE JEROME BOGUCKI, )
DETECTIVE VALERIE LYMPERIS, )
DETECTIVE ANTONIO ALLEN, )
DETECTIVE MICHAEL MUZUPAPPA, JR. )
DETECTIVE JOHN HILLMANN, )
DETECTIVE BRUCE KISCHNER, )
DETECTIVE ALAN PERGRANDE, AND )
UNKNOWN CHICAGO POLICE OFFICERS, )

          Defendants. )

Case No. 05 C 3712

Judge Ruben Castillo

## MEMORANDUM OPINION AND ORDER

Carrie Warfield ("Carrie"), Lagina Warfield ("Lagina") on behalf of herself and her

minor son Deshaun Fox ("Deshaun"), Jennifer Warfield ("Jennifer"), Latoya Powell ("Latoya"),

Mary Bonner ("Mary"), Sherprinia Bonner ("Sherprinia") on behalf of her minor daughter

Jalessa Bonner ("Jalessa") (collectively, "Plaintiffs") brought this Section 1983 suit against the

City of Chicago (the "City"), Chicago police officers Calvin Chatman ("Officer Chatman") and

Dwayne Collier ("Officer Collier"), and Chicago police detectives Raymond Schalk ("Detective

Schalk"), Jerome Bogucki ("Detective Bogucki"), Valerie Lymperis ("Detective Lymperis"),

Antonio Allen ("Detective Allen"), Michael Muzupappa, Jr. ("Detective Muzupappa"), John

Hillmann ("Detective Hillmann"), Bruce Kischner ("Detective Kischner"), Alan Pergande ("Detective Pergande"), as well as other unknown Chicago police officers (collectively, "Defendants"). (R. 64, Compl.)

## UNDISPUTED FACTS[1]

### I. The Shootings

On June 27, 2004, Carrie, her sister Lagina, Lagina's eight-year old son Deshaun, and their pregnant, eighteen-year old cousin, Jennifer, were living in Carrie's apartment at 5331 West Congress Parkway in Chicago. (R. 198, Pls.' Resp. to Defs.' Stmt. of Facts ¶ 1; R. 206, Defs.' Resp. to Pls.' Stmt. of Add'l Facts ¶ 1.) Fourteen-year old Jalessa was staying with her nineteen-year old aunt, Mary, in an apartment at 5508 W. Congress Parkway. (Id.) Latoya lived at 5234 West Harrison; she was friends with Carrie. (Id.)

On June 27, 2004, at approximately 7:35 p.m., a shooting occurred on the 5300 block of West Congress. (R. 198, Pls.' Resp. to Defs.' Stmt. of Facts ¶ 9.) Sergeant Robert Rentner ("Sergeant Rentner") of the 15th District gang tactical team sent officers to the scene, who determined the shooting was gang-related. (Id.) Sergeant Rentner received information that there was a red Chevy on that block which may have had a cache of weapons, and he assigned Officers Chatman and Collier to go to the location in a covert van, dressed in civilian clothes, to conduct surveillance of the car. (Id. ¶ 10.)

---

[1] These facts are undisputed unless noted herein. Undisputed material facts set forth by a party are deemed admitted unless controverted by the opposing party. (L.R. 56.1(a), L.R. 56.1(b)(3)(C).) In their response to Plaintiffs' statement of additional facts (R. 206), Defendants object often on the basis that statements are immaterial or do not raise a genuine issue of material fact. The Court has considered these objections and overrules them to the extent the statements are included within the material facts set forth herein.

2

Officer Chatman drove the van and parked at approximately 5310 West Congress. (*Id.* ¶ 11.) Officers Chatman and Collier located the red Chevy and remained in the front seat of the van to conduct their surveillance. (*Id.*) A police beat car was also present at the intersection of Lockwood and Congress. (*Id.*)

At that time, a group of young black males were standing on the sidewalk on the north side of the street. (*Id.* ¶ 12.) Officer Chatman testified in his deposition that he observed one of the young black males walk east on Congress toward where the van was located, then return to the group and gesture toward the van. (*Id.*) Kejaun Harper ("Harper"), of 5330 West Congress, was part of this group, which also included Mandress Brady, Arnold Barnes, Deandre Lee, Darryl McCord, and his brother Jabar. (*Id.* ¶ 13.) Kejaun testified that Seneca Smith ("Smith") walked up to the group as did another person from the neighborhood named Jamal, but then Seneca walked away from the group heading east towards Lockwood. (*Id.*)

Officer Chatman testified that Smith left the group with his right hand underneath his jersey at his belt/waist area, keeping his hand there as he walked east on Congress on the north side of the street until he got to approximately one house west of the van's location, and then began to jog or run toward the passenger side door of the van. (*Id.* ¶ 14.) Dora Wooden ("Wooden"), who lived at 5314 West Congress, testified that the closest Smith came to the van was the edge of the sidewalk next to Wooden's front lawn. (R. 198, Pls.' Resp. to Defs.' Stmt. of Facts ¶ 14 & Ex. Q, Wooden Dep. at 67-68, 72, 81.) Officers Chatman and Collier testified, by contrast, that Smith came up to the van and asked the officers what they wanted. (*Id.* ¶ 15.) Officer Chatman testified that he told Smith they were police officers and reached for his badge to show Smith. (*Id.*) Officer Chatman then saw a weapon in Smith's right hand, coming up at a

3

45-degree angle toward Officer Collier's head. (*Id.* ¶ 16.) Officer Chatman then fired twice at Smith. (*Id.*)

Smith fell to the ground, and then got up and began running westbound on Congress. (*Id.* ¶ 17.) Smith still had the gun in his hand. (*Id.*) Officer Collier gave chase and ran westbound down the sidewalk. (*Id.*) Officer Collier testified that he identified himself as a police officer and displayed his badge. (*Id.*) Officer Chatman gave chase parallel to Smith and Officer Collier. (*Id.*) At about three or four houses from the van's location, Smith made a 45-degree turn and crossed into the street. (*Id.* ¶ 18.) Smith turned slightly to his left and fired his weapon in Officer Collier's direction. (*Id.*) In response, Officer Collier fired two shots in Smith's direction. (*Id.* ¶¶ 18-19.) Officers Collier and Chatman testified that they continued to identify themselves as police officers. (*Id.*)

Smith ran toward the apartment building at 5331 West Congress. (*Id.* ¶ 19.) He ran up to the outside door and pushed his way in. (*Id.* ¶ 21.) Officers Collier and Chatman testified that Officer Collier shot Smith while he was attempting to force the door open at 5331 West Congress, and as the door opened up, Smith fell inside the hallway. (*Id.* ¶ 19.) Officers Chatman and Collier further testified that they could not see or hear anyone in the vestibule (or hallway) of the apartment building when Officer Collier shot Smith. (R. 206, Defs.' Resp. to Pls.' Stmt. of Add'l Facts ¶ 5.)

Plaintiffs Carrie, Jennifer, Latoya, Mary, Jalessa, and their friends Chantel Davidson ("Chantel") and Katrina Robinson ("Katrina") were in the vestibule at 5331 West Congress when Smith entered the vestibule. (R. 198, Pls.' Resp. to Defs.' Stmt. of Facts ¶ 21.) These girls had been walking together eastbound on Congress on the south side of the street toward Carrie's

4

apartment at 5331 West Congress when they heard the shooting, at which point they ran into the dark vestibule of 5331 West Congress and shut the door. (*Id.* ¶¶ 20-22.) They could not get down to Carrie's basement apartment and were banging on the door. (*Id.*) They pressed themselves against the sides of the vestibule walls for protection. (R. 206, Defs.' Resp. to Pls.' Stmt. of Add'l Facts ¶ 4.) The vestibule was approximately 3.5 feet by 6.5 feet, and the exterior door to the vestibule was glass surrounded by a wood frame. (*Id.*)

Plaintiffs did not hear Officers Chatman or Collier identify themselves as police officers. (R. 198, Pls.' Resp. to Defs.' Stmt. of Facts ¶ 18-19.) Plaintiffs testified that Smith was shot after he entered the door at 5331 West Congress. (*Id.* ¶ 19.) They testified that they could see people pointing guns at them and that they were screaming as the shots were fired. (R. 206, Defs.' Resp. to Pls.' Stmt. of Add'l Facts ¶ 5.) Officers Chatman and Collier heard voices coming from inside the basement after Smith entered the basement apartment. (*Id.*)

Plaintiffs knew Smith as someone from the neighborhood. (R. 198, Pls.' Resp. to Defs.' Stmt. of Facts ¶ 21.) When he entered the vestibule, Smith stood in the middle of the glass door; he was very big. (*Id.* ¶ 22.) The parties dispute whether Smith had a gun in his hand when he was shot. (*Id.* ¶ 16.) Plaintiffs testified that the officers fired additional shots into the vestibule, but the officers deny firing a third time into the hallway. (*Id.* ¶ 19.) One of Officer Collier's bullets hit thirteen-year-old Chantel in the shoulder, and Smith was also hit by one or more bullets. (R. 206, Defs.' Resp. to Pls.' Stmt. of Add'l Facts ¶ 6.) Carrie testified that she thought the shooters were gang members. (*Id.*)

Lagina was asleep in the back of the apartment with her son Deshaun when she heard banging on the door and Carrie's voice yelling. (*Id.* ¶ 24.) Lagina heard three gunshots as she

5

approached the bottom of the stairs. (*Id.*) She unlocked the door of the apartment and then ran to the bed to cover her son. (*Id.*) Lagina then walked back to the front of the apartment where the girls were standing and saw Seneca on the floor of the stairs. (*Id.*) When the door to the apartment opened, the girls ran downstairs, with Carrie and Latoya pulling Smith downstairs with them. (*Id.*) Once inside, Carrie called the police to report that someone had gotten shot and that someone else was trying to enter her apartment. (R. 206, Defs.' Resp. to Pls.' Stmt. of Add'l Facts¶ 10.) Officers Collier and Chatman never entered the apartment. (R. 198, Pls.' Resp. to Defs.' Stmt. of Facts ¶ 19.)

## II.    After the Shootings

When additional police arrived at the apartment, they came into the basement with their guns drawn and told the girls to sit down. (R. 198, Pls.' Resp. to Defs.' Stmt. of Facts ¶ 25.) There were numerous non-Defendant police officers in uniform and in plain clothes present at the scene. (R. 206, Defs.' Resp. to Pls.' Stmt. of Add'l Facts ¶ 12.) Smith was handcuffed, and Plaintiffs were searched individually. (R. 198, Pls.' Resp. to Defs.' Stmt. of Facts ¶ 25.)

Ambulances came to take Chantel and Smith to the hospital. (R. 198, Pls.' Resp. to Defs.' Stmt. of Facts ¶ 28.) Chantel made an oral statement to police that Smith had a gun as he approached the front door of 5331 West Congress. (*Id.* ¶ 45.)

An unknown police officer told the girls they had to go to the station for questioning. (*Id.* ¶ 29.) Jalessa, Mary, and Jennifer told the police they did not want to go. (*Id.* ¶ 30.) An unknown officer or officers searched Carrie's apartment with her consent, but did not find a gun. (R. 206, Defs.' Resp. to Pls.' Stmt. of Add'l Facts ¶ 13.) The officers transported Plaintiffs to the police station, but the parties dispute whether Plaintiffs went willingly or unwillingly. (*Id.* ¶ 12.)

6

Detectives Schalk and Bogucki were assigned to investigate the shootings at approximately 11 p.m. (*Id.* ¶ 42.) When they arrived at the scene, there were numerous officers there, and the street was blocked off. (*Id.*) After one to two hours at the scene, Detectives Schalk and Bogucki entered the building at 5331 West Congress. (*Id.* ¶ 43.) They saw that the vestibule had an outside door with glass in it, which had a pair of bullet holes in it. (*Id.*) There was shattered glass lying inside the vestibule. (*Id.*) Inside the vestibule, there were two doors, one leading to a basement apartment, and one leading to the residence above. (*Id.*)

Detective Allen drove Jalessa and Mary from the scene of the shooting to the Area 5 police station to be interviewed. (R. 198, Pls.' Resp. to Defs.' Stmt. of Facts ¶ 41.) Jalessa and Mary were not under arrest, handcuffed, or given *Miranda* warnings. (*Id.*)

Around midnight, Carrie, Jennifer, Lagina, Deshaun, Latoya, Mary, and Jalessa, as well as Katrina, Wooden, and Jerry Blakes ("Blakes") (another witness to the shootings), arrived at the Area 5 station and were brought to the second floor of Area 5 to be interviewed regarding what they saw and heard in connection with the shooting. (*Id.* ¶ 33.) Plaintiffs were not handcuffed at any time, but witnesses are not permitted to walk around freely within the police station. (*Id.* ¶ 32; R. 206, Defs.' Resp. to Pls.' Stmt. of Add'l Facts ¶ 32.) Wooden and her husband, John Redd ("Redd"), went to the police station on their own accord that night because they had witnessed a portion of the shootings. (R. 206, Defs.' Resp. to Pls.' Stmt. of Add'l Facts ¶ 24.)

Area 5 is located on the second floor of the 25th District, at the corner of Grand and Central, more than 3.5 miles from where the shootings occurred. (R. 198, Pls.' Resp. to Defs.' Stmt. of Facts ¶ 44; R. 206, Defs.' Resp. to Pls.' Stmt. of Add'l Facts ¶ 35.) Detectives

7

Hillmann, Lymperis, Pergande, Muzupappa, and Kischner were assigned to help interview witnesses or investigate the scene of the shooting. (R. 198, Pls.' Resp. to Defs.' Stmt. of Facts ¶¶ 3-5.) Detective Lymperis interviewed Mary in the Special Victims Unit ("SVU") office of the station. (*Id.* ¶ 35.) She did not read Mary her *Miranda* rights, and Mary did not ask to make a telephone call during the interview. (*Id.*) Detective Lymperis also sat in on an interview with Jalessa. (*Id.*) A total of 5 or 6 girls were in the SVU office. (*Id.* ¶ 36.) None of them asked Detective Lymperis if they could leave. (*Id.*) Detective Lymperis conducted a second interview of Mary and Jalessa around 5 a.m. because there was new information that they may have seen Smith with a gun. (*Id.* ¶ 37.) Mary and Jalessa maintained that they did not see a gun. (*Id.*)

Detective Muzupappa interviewed Katrina and Lagina twice. (*Id.* ¶ 38.) He observed that at one point the girls were escorted into a smaller office, and they were given drinks and food. (*Id.*) Lagina maintained that she did not see Smith with a gun. (*Id.*) The parties dispute as to whether Lagina told Detective Muzupappa she would be willing to remain at the station when asked. (*Id.*) Lagina testified that during her first interview, the police officer called her work and told them she was not coming in. (*Id.* ¶ 69.) Later, she and her son were locked in a room alone, and she had to bang on the door to get a police officer to let her son use the bathroom. (*Id.* ¶ 70.)

Detective Pergande interviewed Carrie twice, during which she maintained that she did not see Smith with a gun. (*Id.* ¶ 40.) The parties dispute whether Carrie agreed to stay longer and whether the Detectives made her and the other Plaintiffs comfortable while they were at the station. (*Id.*) Carrie testified that she was locked in a little room for at least three hours at the station, while she knocked on the door almost constantly, including to go to the washroom. (*Id.* ¶¶ 67-68.) When Carrie was interviewed, she felt that the officers were getting upset because she

8

kept saying there was no gun, and they kept trying to convince her to say there was a gun. (*Id.* ¶¶ 66-67.) Carrie testified that the officers told her that Lagina had said that Carrie had picked up a gun. (*Id.*) When Lagina denied that, the officers brought Lagina into Carrie's interview room. (*Id.*) Lagina denied saying Carrie had picked up a gun. (*Id.*) Lagina and Carrie testified at their depositions that upon hearing this, the officer smacked the back of Carrie's chair and grabbed her arm. (*Id.* ¶¶ 66, 71.)

Lagina got mad and started to cry, and the officers returned her to her own room. (*Id.* ¶ 71.) Lagina then called her father, her boyfriend, and Channel 5 news on her cell phone. (*Id.* ¶ 72.) Lagina's son, Deshaun, was not questioned. (*Id.* ¶ 73.)

Detective Hillmann interviewed Jennifer. (*Id.* ¶ 39.) Jennifer testified that she was interviewed twice, and that both times, several officers took her to a room and questioned her, at one point telling her that they would lock her up if she did not tell them what Smith did with the gun. (*Id.* ¶¶ 74-75.) Jennifer maintained that she did not see Smith with a gun when he ran into the apartment building. (*Id.* ¶¶ 39, 74-75.) Jennifer testified that she asked to use the bathroom because she was pregnant, but that she did not get to use the bathroom. (*Id.* ¶ 76.) Detective Hillmann, however, testified that he escorted her to the bathroom. (*Id.* ¶ 39.) The parties dispute whether Jennifer remained at the station voluntarily. (*Id.* ¶ 39.) She fell asleep at some point, and more officers came to question her later, asking the same questions. (*Id.* ¶ 76.)

Detective Allen conducted the initial interview of Jalessa at Area 5, and Jalessa stated she did not see Smith with a gun. (*Id.* ¶ 41.) Although Jalessa was fourteen or fifteen at the time of the questioning by the police, neither her mother nor her grandmother ever came to the police station that night. (R. 206, Defs.' Resp. to Pls.' Stmt. of Add'l Facts ¶ 23.) The parties dispute

9

whether Jalessa's parents were ever called by the police. (*Id.*) Detective Allen testified that he did not tell Jalessa she was free to leave. (*Id.* ¶ 33.)

Detective Kischner interviewed Latoya twice at Area 5. (R. 198, Pls.' Resp. to Defs.' Stmt. of Facts ¶ 41.) Latoya was cooperative. (*Id.*) Latoya testified that she told officers that she did not see Smith with a gun and that she wanted to go home. (*Id.* ¶¶ 41, 63.) She further testified that she felt as if the officers were accusing her of helping Smith. (*Id.* ¶ 61.) Detective Kischner testified in his deposition that he does not tell people that they are free to leave the station. (R. 206, Defs.' Resp. to Pls.' Stmt. of Add'l Facts ¶ 33.)

Mary testified that at one point when she was at the police station, an officer put her and Latoya in a locked room with a bench and bars on the wall and door. (R. 198, Pls.' Resp. to Defs.' Stmt. of Facts ¶ 58.) Mary viewed this as a cell. (*Id.*) She testified that she and Latoya were locked in the room for about 40 minutes, despite the fact that they were banging and kicking the door because they had to use the washroom. (*Id.*)

Jennifer, Mary, Lagina, Deshaun, Latoya, and Carrie testified in their depositions that they were held in locked rooms at the police station. (*Id.* ¶ 44.) Defendants dispute whether these doors were locked, but the parties agree that Jalessa was never locked in a room. (*Id.* ¶¶ 44, 54.) The interview rooms in Area 5 are approximate eight by ten feet, with a metal bench and a door with glass in it. (*Id.*) Jalessa, Mary, and Latoya took a cigarette break and washroom break at some point. (*Id.* ¶¶ 52-53.)

Detectives Schalk and Bogucki interviewed Blakes, Wooden, and Redd. (*Id.* ¶ 44.) Redd was placed in a separate room for questioning. (*Id.* ¶ 26.) Wooden objected to being placed in a holding cell, and she remained in an open sitting area with some of the girls. (*Id.* ¶ 27.)

10

The parties dispute whether Plaintiffs voluntarily stayed into the early morning hours at the police station, or whether they were forced to. (*Id.* ¶ 46.) Wooden asked police if she and the girls could go home because they had been there for hours and answered police questions. (*Id.* ¶ 48.) The officers either made them or asked them to wait until the state's attorney and another law department official asked them questions. (*Id.*)

Blakes testified that he heard one officer yelling "police" and saw a badge around another officer's neck. (R. 206, Defs.' Resp. to Pls.' Stmt. of Add'l Facts ¶ 31.) After spending time at the station, Blakes told an officer that he had to leave to go to work, and he was asked to wait until a police officer became available to drive him. (R. 198, Pls.' Resp. to Defs.' Stmt. of Facts ¶ 47.)

Plaintiffs were allowed to leave the station by 8:00 a.m. the next morning, June 28, 2004. (*Id.* ¶ 49.) Carrie's father was waiting on the first floor of the police station and drove Jennifer, Carrie, Lagina, and Latoya from the station to the hospital. (R. 206, Defs.' Resp. to Pls.' Stmt. of Add'l Facts ¶ 36.) Latoya testified that she had a headache and was nauseous, and Jennifer testified that she had a stomachache and was spotting blood. (*Id.*)

The following day, the police came to Jalessa's and Mary's house and told their grandmother or mother that they had to return to the police station. (*Id.* ¶¶ 55, 60.) Jalessa and Mary were driven back to the same police station and questioned again for about two hours about what happened, then driven back home. (*Id.*) Mary told a female interviewer that she did not see a gun on or near Smith. (*Id.* ¶ 57.)

On October 5, 2007, Smith was convicted in state court of two counts of attempted first degree murder and two counts of aggravated discharge of a firearm. (R. 198, Pls.' Resp. to

11

Defs.' Stmt. of Facts ¶ 77.)

## **PROCEDURAL HISTORY**

Plaintiffs' claims have gone through several different iterations. Most recently, Plaintiffs

filed an eight-count Third Amended Complaint (hereinafter, "Complaint") alleging: (1)

Detectives Schalk, Bogucki, Lymperis, Allen, Muzupappa, Jr., Hillmann, Kischner, and

Pergande unlawfully detained Plaintiffs at the police station pursuant to unlawful Chicago Police

Department ("CPD") policies and practices, in violation of 42 U.S.C. § 1983; (2) Defendant

Detectives falsely imprisoned Carrie, Lagina, and Jalessa in violation of state law; (3) Officers

Chatman and Collier used excessive force against Plaintiffs pursuant to CPD policy and practice,

in violation of 42 U.S.C. § 1983; (4) Officers Chatman and Collier are liable for state law

intentional infliction of emotional distress against Plaintiffs; (5) certain officers conducted an

unreasonable search of Carrie and Lagina's residence as well as Jalessa's person in violation of

the Fourth Amendment, pursuant to Section 1983; (6) Officers Chatman and Collier committed

the state law tort of intrusion when they fired their weapons into Lagina and Carrie's apartment

building; (7) a state law claim of *respondeat superior* against the City of Chicago because the

individual Defendants were members and agents of the CPD and acting at all relevant times

within the scope of their employment; and (8) a state law claim alleging that the City must

indemnify the individual defendants who are found liable.

The Court stayed this case on April 11, 2006, pending resolution of the criminal case

against Smith. (R. 119, 4/11/06 Min. Order.) The Court lifted the stay on October 30, 2007, and

ordered all discovery to be completed by February 29, 2008. (R. 162, 10/30/07 Min. Order.) The

Court ordered all *Monell* discovery to remain stayed pending the parties' filing of dispositive

motions. (R. 165, 11/8/07 Min. Order.) Presently pending are Defendants' joint motion for

summary judgment (R. 182), Plaintiffs' motion to bar the testimony of DNA scientist Davere

Jackson (R. 180), and Plaintiffs' motion to withdraw their prior answers to—or failure to

answer—Defendants' requests to admit (R. 187). After these motions were filed, the Court

vacated the May 5, 2008 trial date that had been set on February 20, 2008. (R. 189, 4/3/08 Min.

Order.)

## MOTION TO BAR TESTIMONY

As a preliminary matter, Plaintiffs argue that this Court should bar testimony by Davere

Jackson ("Jackson"), a DNA expert, because Defendants did not disclose Jackson until the last

day of discovery, February 29, 2008; failed to disclose her as an expert witness; and did not

produce documents relating to the DNA evidence until after the close of discovery. (R. 180, Pls.'

Mot. to Bar at 1.) After 5 p.m. on February 29, 2008, Defendants faxed a letter to Plaintiffs'

counsel purporting to supplement their Rule 26(a)(1)(A) disclosures to include Jackson, who had

previously testified at Smith's criminal trial. (R. 180, Pls.' Mot. to Bar, Ex. A, 2/29/08 fax.)

Plaintiffs argue that not only is this a violation of this Court's discovery cut-off order, but it also

violates Federal Rule of Civil Procedure 26(a)(2)(C), which provides that in the absence of a

schedule for expert witness disclosures, all expert disclosures must be made no later than 90 days

before trial. (R. 180, Pls.' Mot. to Bar at 3-4.) Plaintiffs base this calculation on the May 5,

2008, trial date which this Court set on February 20, 2008. (*Id.*)

Plaintiffs contend that they were prejudiced by this delay because discovery has closed,

and they have had no opportunity to take Jackson's deposition or obtain a rebuttal expert. (R.

180, Pls.' Mot. to Bar at 4-5.) Plaintiffs further argue that there was no justification for the delay

13

in disclosure of Jackson because she testified at Smith's trial in October 2007, and the documents related to Jackson's testimony were provided to Detectives Schalk and Bogucki in 2006. (*Id.* at 5.) Furthermore, Jackson conducted her testing back in June 2005. (R. 203, Pls.' Reply in Support of Mot. to Bar at 1.)

Plaintiffs contend that the appropriate sanction is to bar Jackson from providing any opinion testimony at trial. (R. 180, Pls.' Mot. to Bar at 5.) If a party does not timely disclose an expert as required by the Federal Rules, the district court may exclude the party's expert from testifying at trial on the matters the party was required to disclose. *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 785 (7th Cir. 2000) (citing Fed. R. Civ. P. 26(a)(2)); *see also* Fed. R. Civ. P. 37(c)(1) ("[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.") The sanction of exclusion is "automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless." *NutraSweet*, 227 F.3d at 785-86 (quoting *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996)).

Defendants admit that they erred in not disclosing Jackson as a witness under Rule 26(a)(2), instead of Rule 26(a)(1), because she will be providing expert testimony. (R. 190, Defs.' Resp. to Pl.s' Mot. to Bar at 2.) Defendants, argue, however, that their disclosure of Jackson was timely under Rule 26(a)(2)(C) because the Court did not set a trial date until February 20, 2008, so they could not have known when 90 days before trial would be. (*Id.* at 3-4.) Accordingly, Defendants contend that their disclosure of Jackson on the evening of the last day of discovery was timely. This argument, however, overlooks the fact that by the close of

14

discovery, *all* discovery must be completed, including the opposing party's attempt to discover

rebuttal evidence. By not disclosing Jackson until the final evening of discovery, Defendants

made it impossible for Plaintiffs to complete their discovery as to Jackson. As such, Defendants'

last minute disclosure of Jackson was not timely.

Nevertheless, Defendants argue that even if their disclosure of Jackson was untimely, the

late disclosure was harmless.[2] (*Id.* at 5.) "[T]he determination of whether a Rule 26(a) violation

is justified or harmless is entrusted to the broad discretion of the district court." *David v.

Caterpillar, Inc.* 324 F.3d 851, 857 (7th Cir. 2003) (internal citations and quotations omitted).

"[T]he following factors should guide the district court's discretion: (1) the prejudice or surprise

to the party against whom the evidence is offered; (2) the ability of the party to cure the

prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness

involved in not disclosing the evidence at an earlier date." *Id.* Defendants argue that Jackson

was not a surprise witness because the scope and content of her testimony was known to both

parties when Defendants produced portions of the criminal trial transcript on January 10, 2008.

(R. 190, Defs.' Resp. to Pl.s' Mot. to Bar at 5.) According to Defendants, Jackson's testimony

will mirror her testimony at the criminal trial in October 2007, in which she testified as to the

DNA testing she conducted on the gun found near the scene of the shooting, from which she

determined that a match existed between the gun and Smith. (*Id.* at 1-3.) Defendants argue that

_____

[2] Defendants' argument that their delay in disclosure was justified is a nonstarter.
Defendants argue that their delay was justified because they thought that after Seneca's criminal
trial, Plaintiffs would abandon their argument that Seneca did not have a gun in the vestibule, and
they did not learn Plaintiffs would pursue the argument until November 2007. (*Id.* at 4.)
Defendants' unsubstantiated, subjective belief as to Plaintiffs' litigation strategy, however, does
not make Defendants' delay justified. Moreover, Defendants do not explain their additional
three-month delay in disclosure from November 2007 to February 29, 2008.

Plaintiffs' counsel should have known of Jackson's testimony as early as the date of the criminal trial because they were in close contact with Smith and his criminal defense counsel. (*Id.* at 5-6) In addition, Defendants argue that there was no bad faith or willfulness on their part. (*Id.* at 6-7.)

Despite Defendants' protestations to the contrary, the Court finds that the late disclosure of Jackson—on the evening of the close of discovery—did indeed prejudice Plaintiffs because discovery had closed, leaving them with no opportunity to rebut Defendants' designation of Jackson as a witness, or even to take her deposition. (R. 204, Pls.' Reply at 1-2.) Nevertheless, the Court finds that the prejudice can be cured. Defendants do not object to Plaintiffs deposing Jackson after the close of discovery, and Plaintiffs have time to do so since the May 2008 trial date has been vacated and no new trial date has been set. (R. 190, Defs.' Resp. to Pls.' Mot. to Bar at 6.) Accordingly, the Court will extend discovery for the limited purpose of allowing Plaintiffs to take Jackson's deposition and retain a rebuttal expert if they choose to do so.

## FAILURE TO RESPOND TO REQUESTS TO ADMIT

Plaintiffs have also filed a "motion to withdraw their admissions and submit responses to Defendants' requests to admit." (R. 187.) Plaintiffs never responded to the requests to admit that Defendants served on Plaintiffs on February 9, 2006. (R. 192, Defs.' Resp. to Pls.' Mot. to Withdraw their Admissions at 1.) Under Federal Rule of Civil Procedure 36(a)(3), "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter . . ." Fed. R. Civ. P. 36(a)(3). Nevertheless, the Court may, on motion, "permit withdrawal or amendment [of the admission] if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action

16

on the merits." Fed. R. Civ. P. 36(b).

Allowing Plaintiffs to respond to the requests to admit would without a doubt "promote the presentation of the merits of the action." Fed. R. Civ. 36(b). Moreover, allowing Plaintiffs to respond would not prejudice Defendants. Defendants argue that they would be prejudiced by allowing Plaintiffs to respond two years after the answers to the requests to admit were due because they relied on Plaintiffs' failure to respond as an admission that they would not try to argue that Smith did not possess or fire a gun. (R. 192, Defs.' Resp. to Pls.' Mot. to Withdraw their Admissions at 2-4.) While the Court does not condone Plaintiffs' failure to follow the discovery rules, Defendants' reliance is unreasonable, especially in light of the fact that by November 2007, it had become clear to Defendants that Plaintiffs were disputing Smith's gun possession. (*Id.* at 6.)

Moreover, in light of the often contentious, three-year history of this case, it should come as no surprise to Defendants that Plaintiffs dispute many of Defendants' contentions. Indeed, Plaintiffs' draft responses to the requests to admit demonstrate the wide gap between the parties' views. In the responses, Plaintiffs deny 17 of the 36 request to admit. (R. 192, Ex. B, Pls.' Draft Resps. to Requests to Admit.) Further, Defendants will not be prejudiced by allowing Plaintiffs leave to answer the requests to admit because they have already seen a draft of Plaintiffs' answers, and discovery has been extended due to Defendants' late disclosure of Jackson.[3]

---

[3] The Seventh Circuit opinion in *Banos v. City of Chicago*, is distinguishable. In that case, "the plaintiffs elected to renounce one theory of recovery in order to pursue another," but when that second approach failed, they "tried to resuscitate their original claim." 398 F.3d 889, 891 (7th Cir. 2005). The Court determined that after conclusively admitting certain facts, the plaintiffs could not "flip flop" and amend their responses to sustain the prior cause of action after the close of discovery. By contrast, Plaintiffs are not trying to revive abandoned claims, but to promote the presentation of the merits of this suit by supplying answers to the requests to admit.

Thus, while the Court disapproves of Plaintiffs' serious mistake in failing to timely respond to the requests to admit, the Court grants Plaintiffs' motion because Defendants will not be prejudiced, and allowing Plaintiffs to answer will promote the presentation of the merits of this action. As agreed to by the parties, the Court will nevertheless allow the admissions cited to in Defendants' Local Rule 56.1 statement of facts and motion for summary judgment to stand for purposes of the motion for summary judgment. (R. 192, Defs.' Resp. to Pls.' Mot. to Withdraw their Admissions at 2, 6.) The Court gives Plaintiffs 21 days to file their responses to Defendants' requests to admit.

## SUMMARY JUDGMENT

### I.    Legal Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Levy v. Minnesota Life Ins. Co.*, 517 F.3d 519, 520 (7th Cir. 2008). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008). The Court must view all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party. *Lapka v. Chertoff*, 517 F.3d 974, 981 (7th Cir. 2008). Summary judgment is not appropriate if the court must make a choice between reasonable inferences arising from undisputed facts. *Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003). However,

"[i]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Tubergen v. St. Vincent Hosp. and Health Care Ctr., Inc.*, 517 F.3d 470, 473 (7th Cir. 2008) (quoting *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004)).

"Summary judgment cannot be used to resolve swearing contests between litigants," and a "court may not make credibility determinations [or] weigh the evidence . . ." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (citations omitted). "Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer*, 518 F.3d at 484-85 (internal citations and quotations omitted).

## II.   Analysis

In their response to Defendants' joint motion for summary judgment, Plaintiffs agreed to the dismissal of Counts V and VI of their Complaint. (R. 195, Pls.' Mot. for Leave to File Excess Pages, Ex. A, Resp. Br. at 17 n.6.)[4] Pursuant to the parties' agreement, these Counts are dismissed. Accordingly, what remains of Plaintiffs' claims are: (1) a Section 1983 claim for unlawful detention at the police station brought by all Plaintiffs; (2) a state law claim for false imprisonment brought by Carrie Warfield, Lagina Warfield, and Jalessa Bonner; (3) a Section 1983 claim for excessive force against Officers Chatman and Collier brought by Carrie, Jennifer, Latoya, Mary, and Jalessa; (4) a state law claim for intentional infliction of emotional distress against Officers Chatman and Collier brought by Carrie, Jennifer, Latoya, Mary, and Jalessa; and (5) state law claims for indemnification and *respondeat superior* brought by all Plaintiffs against

---

[4] Plaintiffs' brief in response to Defendants' motion for summary judgment was docketed as an exhibit to their motion for leave to file excess pages *instanter*. (R. 195.)

the City. (R. 182, Defs.' Mot. for Summ. J. at 2-3.) The parties do not address Plaintiffs' *Monell* claims as the Court has stayed all *Monell* discovery. (R. 165, 11/8/07 Min. Order.)

## A.    Excessive Force

Count III of the Complaint alleges that the conduct of Officers Chatman and Collier at the scene of the shooting—while Plaintiffs were in the apartment vestibule—constituted "excessive force in violation of the United States Constitution." (R. 64, Compl. ¶ 38.) In their opposition brief, Plaintiffs argue that Officers Chatman's and Collier's actions amounted to a Fourth Amendment "seizure." Although Plaintiffs "may not amend [their] complaint through arguments in [their] brief in opposition to a motion for summary judgment," *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996), Plaintiffs' claim fails regardless of whether it is framed as one for excessive force or unreasonable seizure.

Plaintiffs do not identify a specific constitutional section violated, but because Section 1983 is not itself a source of any substantive rights, the Court must identify the specific constitutional or statutory rights allegedly infringed. *Bublitz v. Cottey*, 327 F.3d 485, 488 (7th Cir. 2003). In their summary judgment briefs, Defendants argue that Officers Chatman's and Collier's actions should be analyzed under the Fourteenth Amendment, while Plaintiffs argue that their actions should be analyzed under the Fourth Amendment. Under either standard, Plaintiffs' claim fails.

The Fourth Amendment provides that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." U.S.

20

Const. Amend. IV. Thus, to determine whether Plaintiffs state a Fourth Amendment cause of action, the Court must determine: (1) if Officers Chatman's and Collier's conduct constituted a search or seizure; and (2) whether the search or seizure, if one occurred, was reasonable.

A Fourth Amendment seizure occurs only when there is a "governmental termination of freedom of movement *through means intentionally applied.*" *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (emphasis in original). The means of detention must be intentionally applied "to the object of the detention." *Berg v. County of Allegheny*, 219 F.3d 261, 269 (3d Cir. 2000). "[A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is governmental termination of freedom of movement through means intentionally applied." *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998). Therefore, where a police officer fires his gun at a fleeing suspect and the bullet inadvertently strikes an innocent bystander, there has been no Fourth Amendment seizure. *Berg*, 219 F.3d at 269; *see also Medeiros v. O'Connell*, 150 F.3d 164, 169 (2d Cir. 1998) ("Where the hostage is hit by a bullet intended for the hostage-taker, the mishap is the unintended consequence of government action, and the governing principle is that such consequences cannot form the basis for a Fourth Amendment violation); *Brandon v. Village of Maywood*, 157 F. Supp. 2d 917, 924-25 (N.D. Ill. 2001) (no Fourth Amendment cause of action for accidental shooting of innocent bystander).

Plaintiffs here are like the innocent bystander or passerby described in the cases above. Whether or not the officers knew Plaintiffs were in the vestibule when they fired at Smith, there

21

is no dispute that Plaintiffs were not the intended targets of the officers' bullets. In *Bublitz v. Cottey*, for example, a family was killed after their vehicle collided with the car of a fleeing felon when police officers used a tire-deflation device to stop the felon's car. 327 F.3d 485, 489 (7th Cir. 2003). In that case, the Seventh Circuit reasoned that just because the officer intended to stop the felon's car, it does not follow that he therefore intended to stop any other car that could potentially become involved in a subsequent collision. *Id.* The Court held that the family's suffering was an "accidental and wholly unintended consequence;" because the family "was simply not the intended object" of the defendant officers' attempts to seize the fleeing criminal. *Id.* Therefore, the Fourth Amendment was not implicated and could not provide the basis for a Section 1983 claim. *Id.* Similarly, in the instant case, Plaintiffs were not the intended object of the officers' attempts to seize Smith, and so the Fourth Amendment is not implicated here.

Nor does the Fourteenth Amendment substantive due process guarantee provide recourse for Plaintiffs here. "The guarantee of due process serves to protect the individual against arbitrary action of government." *Schaefer v. Goch*, 153 F.3d 793, 797 (7th Cir. 1998). "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense. . . .'" *Bublitz*, 327 F.3d at 490. When officers are faced with a "dangerous, fluid situation, in which they were forced to make decisions in haste, under pressure," their conduct does not violate the Fourteenth Amendment unless it "shocks the conscience." *Schaefer*, 153 F.3d at 797-98 (citing *Lewis*, 523 U.S. at 846-47). In these cases, "even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates the concerns of substantive due process." *Id.* "The *sine qua non* of liability" in these cases is "a purpose to cause harm." *Id.* In *Schaefer*, the defendant officers fired their weapons at a husband who was holding his wife

22

hostage, and accidentally fatally shot the wife. *Id.* at 798-99. The Seventh Circuit held that the officers' conduct did not "shock the conscience" because the officers did not intend to shoot the wife. *Id.*

Officers Chatman and Collier were in the type of "dangerous, fluid situation" to which the shocks the conscience standard applies. Smith had just pointed a gun at Officers Chatman and Collier, and the officers were giving chase. To "shock the conscience," the officers must have intended to cause harm *to Plaintiffs. Schaefer*, 153 F.3d at 798-99. Although the parties dispute whether the officers knew Plaintiffs were in the vestibule when the officers fired their guns, there is no evidence of any intention or purpose on the part of the officers to cause harm *to Plaintiffs. See Bublitz*, 327 F.3d at 491-92 (plaintiff's Fourteenth Amendment claim failed because he did not seek to prove any intention or purpose on the part of the defendants to cause harm to his family during the course of the high-speed chase after a fleeing felon). Therefore, Plaintiffs' Section 1983 claims against Officers Chatman and Collier fail.[5]

## B.    Intentional Infliction of Emotional Distress

In Count IV of the Complaint, Plaintiffs bring a state law claim for intentional infliction of emotional distress against Officers Chatman and Collier, alleging that they engaged in extreme and outrageous conduct by firing their weapons at Plaintiffs. (R. 64, Compl. ¶ 45.) In Illinois, a

---

[5] Because Plaintiffs fail to state a claim for a constitutional violation while they were trapped in the vestibule, the Court does not reach the issue of qualified immunity. *See Saucier v. Katz*, 533 U.S. 194 (2001) (two-part qualified immunity analysis requires plaintiff to make out claim for constitutional violation before reaching question of whether constitutional right was clearly established); *see also Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008) ("If the plaintiff cannot establish that the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right—the first step in the *Saucier* analysis—[the Court's] inquiry ends, and summary judgment for the defendant is appropriate.")

plaintiff must satisfy three requirements for a showing of intentional infliction of emotional distress: "(1) the conduct involved must be truly extreme and outrageous; (2) the actor must either intend that his conduct inflict severe emotional distress; or know that there is at least a high probability that his conduct will cause severe emotional distress; and (3) the conduct must in fact cause severe emotional distress." *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 746 (7th Cir. 2008) (internal citations and quotations omitted). "This standard is quite high. In order to meet the threshold for intentional infliction of emotional distress, the defendant's conduct must extend beyond the bounds of human decency and be considered intolerable in a civilized community." *Id.* at 747 (citing *Doe v. Calumet City*, 641 N.E.2d 498, 507 (Ill. 1994); *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992)). The Court employs an objective standard to determine whether the conduct alleged is extreme and outrageous, taking into consideration, among other things: "the degree of power or authority which a defendant has over a plaintiff; whether the defendant reasonably believed that his objective was legitimate; and whether the plaintiff is particularly susceptible to emotional distress because of some physical or mental condition or peculiarity." *Id.*

Plaintiffs here cannot show that the officers' conduct was "truly extreme and outrageous," because, as explained above, the officers were in pursuit of an apparently armed and dangerous criminal who had just threatened their lives. Under these facts, the officers reasonably believed that their objective—pursuing Smith—was legitimate. *See Lewis*, 523 F.3d at 747 (court takes into consideration the particular facts of the case in determining whether conduct alleged is extreme and outrageous).

Moreover, Plaintiffs have not presented evidence that they suffered sever emotional

24

distress. In Illinois, "emotional distress alone is not sufficient to give rise to a cause of action. The emotional distress must be severe." *Sornberger*, 434 F.3d at 1030 (citing *Pub. Fin. Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976)). "Although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not actionable." *Id.* (quoting *Kleidon v. Rizza Chevrolet, Inc.*, 527 N.E.2d 374, 377 (Ill. App. Ct. 1988)). Chantel, the innocent bystander shot during Officers Chatman's and Collier's pursuit of Smith, is not a plaintiff in this case. In essence, all that remains are Plaintiffs' complaints of "fright, horror, grief, shame, humiliation, [and] worry," which are not sufficient to state a claim for intentional infliction of emotional distress.

Therefore, Count IV of Plaintiffs' Complaint cannot survive summary judgment.

## C. Unlawful Detention

In Count I, Plaintiffs allege that Detective Defendants caused them to be unlawfully and unreasonably detained at the police station without justification in violation of 42 U.S.C. § 1983.[6] (R. 64, Compl. ¶ 26.) Under the Fourth Amendment, in order to establish that the actions of the detectives at the station constituted a "seizure," Plaintiffs "must demonstrate, from all the circumstances surrounding the incident, that a reasonable person in such a situation would have believed that he was not free to leave." *Belcher v. Norton*, 497 F.3d 742, 748 (7th Cir. 2007) citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Further, the governmental termination of freedom of movement must be intentional. *Id.* This type of seizure occurs only if

---

[6] Further, Plaintiffs allege that this conduct was undertaken pursuant to certain unlawful policies and practices of the CPD. (R. 64, Compl. ¶ 29.) As discovery as to Plaintiffs' *Monell* claims has been stayed, the parties have only addressed the claims against the individual Defendants.

two conditions are met. "First, the officer must, through physical force or a show of authority, communicate to a reasonable person that he is not at liberty to ignore the police presence and go about his business. Second, when the officer's encounter with the plaintiff is nonphysical, the plaintiff must have submitted to the show of authority to establish that a seizure has taken place." *Christensen v. County of Boone, IL*, 483 F.3d 454, 460 (7th Cir. 2007) (internal citations and quotations omitted).

When an officer seeks a citizen's "voluntary cooperation through non-coercive questioning," no Fourth Amendment seizure has occurred. *United States v. Scheets*, 188 F.3d 829, 836 (7th Cir. 1999). Police are entitled to invite witnesses, including suspects, to the police station for questioning. *Hall*, 508 F.3d at 857. The question is whether "a reasonable person would feel free to disregard the police and go about his business." *Scheets*, 188 F.3d at 836 (internal citations omitted). The Seventh Circuit has identified several factors to consider in determining whether, based on the totality of the circumstances, a reasonable person would believe he was free to leave, including: "whether the encounter occurred in a public or private place; whether the suspect was informed that he was not under arrest and free to leave; whether the suspect consented or refused to talk to the investigating officers; whether the investigating officers removed the suspect to another area; whether there was physical touching, display of weapons, or other threatening conduct; and whether the suspect eventually departed the area without hindrance." *Id.* at 836-37 (internal citations and quotations omitted).

When a suspect does not ask whether he is free to leave, however, "the inference arises that he does not want to terminate the questioning but instead wants to use the opportunity to deflect the suspicion of the police." *Hall v. Bates*, 508 F.3d at 857. The courts have not imposed

"a *Miranda*-like rule requiring police whenever they question someone at a police station to advise him that he is not under arrest and is therefore free to leave at any time." *Id.* at 857-58 (citing *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996)). The law places the burden on the individual to ask whether he is free to leave rather than require speculation by judges or juries on whether the circumstances of a particular interrogation were so intimidating that the average person being questioned would have thought himself under arrest. *Id.* at 858. "It's as if one were in a room with the door closed and rather than turning the knob one sued for false imprisonment, though in fact the door was not locked." *Id.*

Here, there is a genuine issue of material fact as to whether a reasonable person in Plaintiffs' situation would have believed that he was free to leave the police station at all times during the investigation. The parties dispute whether various Plaintiffs voiced their desire to leave the station, or whether any of them asked whether they were free to leave. The parties also dispute whether the doors to the interrogation rooms were locked, and whether Plaintiffs tested the doors to determine if they were locked.[7] Therefore, Defendants' motion for summary judgment as to Plaintiffs' Fourth Amendment claim for unlawful detention is denied.

### D.  False Imprisonment Under State Law

Count II of the Complaint alleges that the detective Defendants violated the state law prohibition on false imprisonment by unlawfully and unreasonably arresting and detaining

---

[7] Defendants also argue that Plaintiffs have not raised a genuine issue of material fact because they have not established the identities of the officers who made Plaintiffs believe they were not free to leave. (R. 205, Defs.' Reply at 12.) This argument is a nonstarter. Each Plaintiff has identified particular detectives with whom they had contact at the police station. Defendants' argument that other officers also had contact with Plaintiffs at the police station does not resolve the genuine issue of material fact as to whether the conduct of the named Defendant Detectives constituted an unreasonable seizure of Plaintiffs under the Fourth Amendment.

Carrie, Lagina, and Jalessa at the police station. (R. 64, Compl. ¶¶ 32-33.) Under Illinois law, "[a] claim for false imprisonment requires a showing that 'the plaintiff was restrained or arrested by the defendant, and that the defendant acted without having reasonable grounds to believe that an offense was committed by the plaintiff.'" *Reynolds v. Menard, Inc.*, 850 N.E.2d 831, 837 (Ill. App. Ct. 2006) (quoting *Meerbrey v. Marshall Field & Co.*, 564 N.E.2d 1222 (Ill. 1990)). "Put another way, to succeed on a claim for false imprisonment, a plaintiff must show that he was restrained unreasonably or without probable cause." *Id.* An arrest or restraint occurs when a reasonable person would believe he was not free to leave. *People v. Goodum*, 828 N.E.2d 835, 840 (Ill. App. Ct. 2005). A person's freedom of movement may be restrained by physical force or a show of authority. *People v. Jackson*, 810 N.E.2d 542, 552 (Ill. App. Ct. 2004) (citing list of factors to consider in determining whether person was restrained or arrested).

This test for stating a claim for false imprisonment under Illinois law is similar to the test for stating a claim for unlawful detention under the Fourth Amendment. For the reasons set forth in the preceding section, Carrie, Lagina, and Jalessa have established a genuine issue of material fact as to whether a reasonable person in their situation would have believed they were free to leave the police station. Therefore, Defendants' motion for summary judgment as to Count II is denied.

### E. *Monell* Claims

Counts I and III contain *Monell* claims against the City; that is, allegations that the City has certain unconstitutional policies, practices, or customs that created, condoned, or turned a blind eye to the Defendants officers' and detectives' alleged unconstitutional conduct. A municipality can be found liable under Section 1983 if the municipality itself, through a

28

municipal policy or custom, deprives someone of their constitutional rights. *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).

A municipality may not be held liable for a constitutional injury, however, unless there is a finding that the individual officer is liable on the underlying substantive claim. *Treece v. Hochstetler*, 213 F.3d 360 (7th Cir. 2000). In other words, if an officer has not violated an individual's constitutional rights, "it is inconceivable that [the city] could be liable." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

Although this Court has stayed *Monell* discovery, Plaintiffs' claims against the City in Count III, based on the conduct of Officers Chatman and Collier, must fail because Plaintiffs' Fourth Amendment claims against Officers Chatman and Collier have been dismissed. On the other hand, as Plaintiffs' claims against the individual Defendants in Count I remain, Plaintiffs' *Monell* claims in Count I also survive summary judgment.

## F.    *Respondeat Superior* and Indemnification

The last two claims of the Complaint, Counts VII and VIII (erroneously labeled as Counts VI and VII) seek to hold the City liable under the common law theory of *respondeat superior* and indemnification, respectively, so that the City will pay compensatory damages for torts committed by the individual Defendants while acting within the scope of their employment with the CPD. (R. 64, Compl. ¶¶ 63-67.) To the extent that the Court has dismissed claims against the individual Defendants, Plaintiffs' indemnification claims are also dismissed. *See* 745 ILCS § 10/2-109 ("[a] local public entity is not liable for any injury resulting from an act or omission of its employee where the employee is not liable"). Moreover, "[a] municipality may not be held liable under § 1983 based on a theory of *respondeat superior* or vicarious liability." *Lewis v.*

*City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (quoting *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir.2007)). Therefore, Plaintiffs' claim for *respondeat superior* in Count VII survives only as to the remaining state law claim—false imprisonment—against the individual Defendants.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is granted in part and denied in part as follows. (R. 182.) Plaintiffs' excessive force claim in Count III and Plaintiffs' intentional infliction of emotional distress claim in Count IV are dismissed. Plaintiffs' claims for *respondeat superior* and indemnification are dismissed in part as discussed above. Defendants' motion for summary judgment as to the remaining claims in the Complaint is denied.

Further, Plaintiffs' motion to bar Defendants' use of an expert (R. 180) is denied, and Plaintiffs' motion to submit responses to Defendants' requests to admit is granted (R. 187). The Court grants Plaintiffs 21 days to respond to Defendants' requests to admit and 45 days to complete discovery as to Defendants' expert Davere Jackson.

The parties are requested to fully exhaust all settlement discussions in light of this opinion. A status hearing will be held in open court on August 5, 2008, at 9:45 a.m. to set a firm trial date for this long-delayed case, unless the Court is informed that this narrowed lawsuit has been settled.

Date: July 16, 2008          ENTERED:

                             **Ruben Castillo**
                             **United States District Judge**

30