IN THE UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| CARRIE WARFIELD, LAGINA WARFIELD individually and on behalf of her minor son, DESHAUN FOX, JENNIFER WARFIELD, MARY BONNER, LATOYA POWELL AND SHERPRINIA BONNER, on behalf of her minor daughter JALESSA BONNER, | ) ) ) ) ) ) ) | 05 C 3712 |
| Plaintiffs, | ) ) | JUDGE CASTILLO |
| v. | ) ) | |
| CITY OF CHICAGO, *et al.*, | ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
JOINT RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW**

Plaintiffs, by and through their attorneys, Loevy & Loevy, hereby submit their response to Defendants' Joint Rule 50(b) Motion for Judgment as a Matter of Law.

## INTRODUCTION

Defendants would have this Court believe that Plaintiffs accused Defendants at random. In so doing, Defendants ignore their own testimony and improperly ask the Court to view the record in the light most favorable to them. Defendants admitted that they were the detectives who questioned the Plaintiffs, they were responsible for Plaintiffs' needs, and they all categorically denied that Plaintiffs were not free to leave. The jury was entitled to discredit Defendants' denials and return a verdict against each particular detective. To the extent Defendants now claim that other detectives were responsible for the unconstitutional detention, that does not negate the jury's finding that the Defendants were also responsible for the constitutional violations. Defendants' motion should be denied.

Plaintiffs were innocent bystanders to a police-involved shooting on June 27, 2004. The Plaintiffs were forced to go to the police station, where the Defendant and non-Defendant detectives held them (including an eight-year-old boy) overnight. The detectives went so far as to lock some of the women and the boy in interrogation rooms although one of the young ladies was pregnant and several were just teenagers (including a fourteen year-old). Plaintiffs did not leave the police station until around 8 a.m. the next morning. This Court should allow the jury's verdict to stand because a reasonable jury could have found that the detectives' actions would have caused a reasonable person in Plaintiffs' situation to believe that he or she was not free to leave. As a result, Defendants are not entitled to judgment as a matter of law.

## LEGAL STANDARD

If this Court determines that "the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed," this Court must allow the jury's verdict to stand by denying Defendants' Joint Rule 50(b) Motion for Judgment as a Matter of Law. *Mathur v. Board of Trustees of Southern Illinois University*, 207 F.3d 938, 941 (7th Cir. 2000). In other words, this Court may not overturn the jury's verdict unless this Court finds that "no rational jury could have found for the plaintiff." *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 630 (7th Cir. 1996). "This is obviously a difficult standard to meet." *Waite v. Board of Trs. of Ill. Cmty. Coll. Dist. No. 508*, 408 F.3d 339, 343 (7th Cir. 2005). Courts "accord great deference to the jury's decision, particularly if affected by issues of credibility."

*McMath v. City of Gary*, 976 F.2d 1026, 1032 (7th Cir. 1992) (citations omitted).  The Seventh
Circuit has described a challenge to sufficiency of the evidence as "a daunting task, given the
deferential standard that applies to such reviews." *Cruz v. Town of Cicero*, 275 F.3d 579, 586
(7th Cir. 2001); *see also Bachenski v. Malnati*, 11 F.3d 1371, 1374 (7th Cir. 1993) (party seeking
to overturn jury verdict "has a tough row to hoe to convince a court that the evidence adduced at
trial cannot support a verdict").

I.    **A Reasonable Jury Could Have Concluded that the Detectives Caused Plaintiffs To
      Be Unconstitutionally Detained**

      The jury correctly found that the Defendant and non-Defendant detectives
unconstitutionally detained an eight-year-old child, a pregnant teenager, a fourteen-year-old girl,
and several other young women in violation of the Fourth Amendment and 42 U.S.C. §1983.
The detectives' actions violated the Fourth Amendment because their actions were intentional
and given "all of the circumstances surrounding the incident, [a] reasonable person in such a
situation would have believed he was not free to leave." *Warfield v. City of Chicago*, 565
F.Supp.2d 948, 966 (N.D.Ill., 2008) (citing *Belcher v. Norton*, 497 F.3d 742, 748 (7th Cir. 2007)
(citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980))).

      The jury diligently spent over two days poring over the verdict form, which asked them
to make 56 findings of fact on the liability portion of the verdict form alone. *Manning v. Miller*,
2005 WL 3078048, at *4 (N.D.Ill. Nov. 14, 2005) (Kennelly, J.) (the jury's sophisticated
consideration of the verdict form "reflects the careful and discerning job that it did evaluating the
evidence and claims during its lengthy deliberations. This was anything but a runaway jury. . .").
Notably, the jury found only against those detectives who admitted having contact with the
particular Plaintiff whose claim the jury was considering. *See, e.g.*, R. 425 at 2 (finding
detectives Muzupappa, Kischner, Lymperis, Allen, and Pergande not guilty of violating
Jennifer's rights where there was no admission that these detectives had contact with Jennifer).

      Defendants argue that Plaintiffs did not identify which detectives were the ones
mistreating them.  However, Defendants presented no evidence that anyone else interacted with
Plaintiffs at the police station (apart from Detective Allen's and Detective Kischner's partners),
despite the fact that they were sitting with the Plaintiffs throughout their time at the station. *See*
R. 792, 796, 991, 993-94, 1310, 1346, 1361.  In fact, Defendants' entire theory of defense was
that Plaintiffs were not detained, not that somebody else was responsible.

Defendants' argument along these lines is a red herring. Plaintiffs accused the detectives questioning them of harassing them and detaining them and the Defendant Detectives admit they were the ones who questioned Plaintiffs. Defendants simply suggest that because they admit having innocuous contact with Plaintiffs and deny any misconduct, they cannot be culpable for Plaintiffs' constitutional violations. But mere denials are not enough to sustain a Rule 50 challenge. *Sivard v. Pulaski County*, 959 F.2d 662, 668 (7th Cir. 1992) (mere denial of knowledge not enough to decide the issue at summary judgment); *see also Johnson v. Picicco*, 2001 WL 219665, at *1 (N.D.Ill. March 6, 2001) (standard by which a Rule 50(b) motion is governed "is essentially the same as that for a motion for summary judgment").

Defendants complain that Plaintiffs did not ask each detective if she could leave. Defendants cite *Hall v. Bates*, 508 F.3d 854 (7th Cir. 2007), for the proposition that individuals should make an effort to determine whether or not they are in fact being detained.[1] Def. Mot. at 4. First, Plaintiffs did make an effort to determine if they were being detained. R. 1018-19; 1181; *see also* 1645-46 ("girls" at the station were asking to go home); R. 555-56, 561-62 (Dora Wooden asked if they were free to go in earshot of the Plaintiffs). More to the point, Plaintiffs were then locked in rooms and told to remain at the police station. *See, e.g.*, R. 190, 192, 244 (Carrie was locked in a room); R. 375 (Lagina and Deshaun were locked in a room); R. 1020 (Latoya was locked in a room); R. 867-68, 899 (Mary was locked in a room); R. 1178 (Jennifer saw Lagina and Deshaun being placed in a room); R. 1182-83 (Jennifer was told to stay in the room she was in); R. 703-04 (Jalessa could hear Mary and Latoya banging on a door while they were locked in a room). Despite not wanting to be at the police station, the Plaintiffs all remained at the station until approximately 8 a.m. the next morning.

The language in *Hall* is hardly applicable to this case where Plaintiffs were told and shown in no uncertain terms that they were not allowed to leave the police station. When one is locked in a room against one's will, asking whether one can leave would be futile. Under the circumstances testified to by the Plaintiffs (which must be credited at this stage), the inference to be drawn from any alleged failure to ask whether they were free to leave is that Plaintiffs already knew they were not free to leave. Plaintiffs had already satisfied the interests protected by *Hall* –

---

[1] *Hall* is distinguishable where it states, "[w]hen a suspect does not ask whether he is free to leave, the inference arises that he does not want to terminate the questioning but instead wants to use the opportunity to deflect the suspicion of the police." *Hall*, 508 F.3d at 857. It is undisputed that Plaintiffs were never suspects, but were

Plaintiffs successfully determined that they were in fact being detained before looking to the courts for relief.

Defendants also complain that Plaintiffs did not identify by name the detectives whose behavior caused them to reasonably believe they were not free to leave. This is not surprising since, as Det. Allen testified, neither he nor the other detectives wore name tags. R. 296. Moreover, none of the Defendants were able to identify any of the Plaintiffs five years after the fact. *See, e.g.* R. 300 (Allen could not identify any of the Plaintiffs). In essence, the Defendants are claiming that because Plaintiffs did not take the stand and point out each Defendant who harmed them, they cannot make out a claim against any of the Defendants.

The same argument was rejected by the Seventh Circuit in *Miller v. Smith*, 220 F.3d 491 (7th Cir. 2000).[2] In *Miller*, the plaintiff claimed that, while he lay face down on the ground, one or more of the defendant officers used excessive force against him. *Id.* at 493. The district court granted summary judgment because the plaintiff could not identify the particular officer who beat him. *Id.* The Seventh Circuit reversed, holding that because Miller was able to identify the officers who were present when he was beaten (through their admissions and police reports), it was a question for the jury to determine whether he was beaten and, if so, which of the officers were responsible for the beating. *Id.* at 495; *see also Cooper v. City of Fort Wayne*, 2007 WL 1455763, at *9 (N.D.Ind. May 15, 2007) (question for jury as to which defendant struck plaintiff who was not able to identify assailant); *Nitsch v. City of El Paso*, 482 F.Supp.2d 820, 829-30 (W.D. Texas 2007) (same).

Likewise, here Plaintiffs presented evidence that each of the Defendant and non-Defendant detectives were the detectives who questioned Plaintiffs, controlled their movement, and were responsible for their care during their detention. As this Court explained in denying Defendants' motion for directed verdict, Plaintiffs produced sufficient evidence in addition to their testimony for a reasonable jury to find in favor of the plaintiffs.[3]

---

witnesses who, in any event, clearly rebutted any inference that they were motivated to cooperate by their desire to deflect suspicion when they protested that they did not want to go to the police station.

[2] Like our Defendants, the *Miller* defendants cited case law that "merely restate[d] the familiar decree that §1983 does not support respondeat superior liability." *Miller*, 220 F.3d at 495. However, Plaintiffs here, like the plaintiff in *Miller,* are not alleging that the defendants were liable as supervisors for the conduct of their supervisees. Rather, Plaintiffs are alleging that each defendant was directly responsible for unlawfully detaining them.

[3] This Court explained, "the problem that I have in coming anywhere close to granting [Defendants' Joint Motion for Directed Verdict] is, one, the standard that I need to apply, plus, two, I need to couple the plaintiffs' testimony with not only their own testimony but the police reports that have been admitted in this case, as well as the adverse

This Court should deny Defendants' Motion for Judgment as a Matter of Law because Plaintiffs presented sufficient evidence to allow a reasonable jury to conclude that the Defendant and non-Defendant detectives unlawfully and unreasonably detained them in violation of the Fourth Amendment and 42 U.S.C. §1983.

### A. A Reasonable Jury Could Have Concluded That Detective Hillmann's Actions Would Have Caused A Reasonable Person in Jennifer Warfield's Situation To Believe That She Was Not Free To Leave

Sufficient evidence existed for a reasonable jury to find that Det. Hillmann unlawfully detained Jennifer. Det. Hillmann testified that he interviewed Jennifer twice, but didn't recall whether he gave Jennifer his name. R. 1304, 1329. The first time he interviewed Jennifer, Det. Hillmann testified that he was the only one speaking to Jennifer and that he did not remember anyone else coming in or out of the office while he did so. R. 1288, 1327, 1356. Det. Hillmann testified that Jennifer told him she was pregnant. R. 1293, 1361. Jennifer testified that during this first interview, a detective asked her repeatedly about a gun and threatened her:

> They told me I could get locked up. I would be held against my will. And they could take my baby from me if I didn't tell them Seneca had a gun. They was telling me Seneca dead, so I could go on and tell them Seneca had a gun. Don't be scared because he's dead now, so you can say he had a gun."

R. 1172-73. Afterwards, Det. Hillmann walked Jennifer back to the seats in the main area, told her that the investigation would continue, and told her that he wanted her to stay. R. 1296-97, 1345. Det. Hillmann testified that he told Jennifer he would be sitting just a few feet away. R. 1346.

Jennifer testified that later, she was taken to another room where 4-5 detectives were waiting. R. 1178-79. However, only one of the detectives questioned her. R. 1179. Det. Hillmann admitted that he interviewed Jennifer a second time. R. 1298. Det. Hillmann testified that during the second interview, he asked Jennifer whether Seneca had a gun. R. 1299, 1350. Jennifer testified that the detective who interviewed her the second time was red in the face and hollered at her, "'I'm gonna take your baby from you if you don't tell me where the gun at.'" R. 1179-81. Jennifer testified that he "just kept on going on and on, then he had slammed his hand on the desk like (indicating), 'You know, where the fuckin' gun at. Tell me where the fuckin'

---

testimony taken from various defendants. When I do all of that, I'm forced to deny the motion." Tr. Proceedings at 1761.

gun at now.'" R. 1179-80.  Carrie testified that she saw a detective hollering at Jennifer about a gun. R. 190.  Carrie said that Jennifer was agitated. R. 191.  Jennifer testified that she asked those detectives if she could leave, saying "I want to go home." R. 1181.  In response, they "[t]old me no. They was giggling, laughing among themselves." R. 1181.  Afterwards, they returned to aggressively interrogating her about a gun, telling her, "Tell me where the fuckin' gun at right now.  You don't tell me where the fuckin' gun at, I'm gonna lock you up." R. 1181-82.

Det. Hillmann also testified that "for most of the other time, when I wasn't interviewing Jennifer, I would have been sitting out in the main part of the floor, which would allow to see [the interview rooms]." R. 1310.  He also spent time sitting with the Plaintiffs. R. 1346, 1361.  Det. Hillmann said that he was trained not to allow witnesses to move freely around the police station without an escort. R. at 1318.

A reasonable jury could credit Jennifer's testimony that the detective who interviewed her the first and second times was aggressive and threatening and controlled her movements.  Indeed, a reasonable jury could infer that it was Det. Hillmann who aggressively interviewed her twice and restricted her movements.  A reasonable jury could conclude that it was Det. Hillmann who threatened Jennifer, stood guard over Jennifer for hours, told her she could not go home, and forbade Jennifer to leave a room in a show of authority intended to communicate to a reasonable person in Jennifer's position that she was not at liberty to leave.

### B.  A Reasonable Jury Could Have Concluded That Detective Pergande's Actions Would Have Caused A Reasonable Person In Carrie Warfield's Situation To Believe That She Was Not Free To Leave

Sufficient evidence existed for a reasonable jury to find that Det. Pergande unlawfully detained Carrie.  It is undisputed that Det. Pergande interviewed Carrie at least twice. R. 1432-33.  Det. Pergande testified that during his first interview of Carrie, he questioned her for 15-20 minutes at a desk in the open area, asked her what happened, elicited a detailed account, but did not ask her about a gun. R. 1433-36.  In contrast, Carrie testified that the detective who initially interviewed her joked about Seneca being dead and only asked her two questions – whether she knew Seneca and whether Seneca had a gun. R. 179-80, 230, 232-33, 238.  A reasonable jury could have concluded that the first interview Det. Pergande alleged could not have been the first interview Carrie described, since what Carrie described was relatively short – only two questions long – while what Det. Pergande described was 15-20 minutes during which he asked her what

happened and elicited a detailed account. A reasonable jury could have credited Carrie's testimony over Det. Pergande's, concluding that either Det. Pergande did more than two interviews of Carrie or, if he only did two interviews, then he did not do the first interview Carrie described.

In fact, Det. Pergande's description of his initial interview with Carrie (15-20 minutes; asked her what happened) is consistent with Carrie's testimony that the second time she was interrogated, the detectives asked her what happened and she gave them a detailed account. R. 181-82. A reasonable jury could infer that it was Det. Pergande who interviewed Carrie this second time. Given this, a reasonable jury could have concluded that it was Det. Pergande who retrieved Carrie from where she was sitting in the open area by telling her "come on," took Carrie to an office, insisted that there was a gun, then became angry, aggressive, and loud when Carrie told him she hadn't seen a gun. R. 181-82, 240.

Carrie testified that during her fourth interview, two detectives were aggressively interrogating her; asking repeatedly whether she had seen a gun. R. 186. One told her that Lagina saw her pick up a gun. R. 186. Lagina testified that a detective brought her to the room where another detective was interviewing Carrie. R. 377. The detective who had been interviewing Carrie angrily hit the back of Carrie's chair when Lagina denied saying that she saw Carrie pick up a gun. R. 242-43, 379. Lagina protested, "don't you hit my sister" and began to cry. R. 187, 379. Carrie also began to cry. R. 187. Afterwards, Lagina was returned to the room with her son and she made several calls for help starting at 3:06 a.m. R. 380-85. Det. Bogucki and Det. Schalk testified that they spoke to several detectives at about 2:30 a.m. R. 623, 1476-77, 1480, 1519. Det. Pergande testified that he interviewed Carrie again immediately after speaking to Det. Bogucki (and shortly before Lagina's 3:06 a.m. phone call). R. 1450-51. Given this, a reasonable jury could have inferred that it was Det. Pergande who did Carrie's fourth interview, aggressively interrogated her, and angrily hit the back of her chair. R. 380-85, 1432.

Based on his aggressive interrogation of her, a reasonable jury could infer that Det. Pergande was one of the detectives who locked Carrie in a cell for about three hours. R. 190, 192-93, 244-47. Moreover, a jury could infer that because Det. Pergande testified that he spent much of his time standing next to Plaintiffs, he was one of the detectives who was monitoring and controlling their movements. R. 1446-47 (testifying that he was standing next to the witnesses a lot of the time).

**C. A Reasonable Jury Could Have Concluded That Detective Muzupappa's Actions Would Have Caused A Reasonable Person in Lagina Warfield's and Deshaun Fox's Situation To Believe That They Were Not Free To Leave**

Sufficient evidence existed for a reasonable jury to find that Det. Muzupappa unconstitutionally detained Lagina and Deshaun. Neither Lagina nor Deshaun witnessed the shooting in front of 5331 W. Congress. Although Defendants maintained that Lagina and Deshaun were at the station voluntarily, Lagina had to work at 4 a.m. that morning and Deshaun was an eight year-old boy who spent the hours from midnight until 8 a.m. at the police station. R. 349-51.

Det. Muzupappa and Lagina agreed that during her second interview – which Det. Muzupappa admitted he conducted – she was asked about a gun. R. 367, 485, 488, 369, 492-93. Given this, a rational jury was entitled to infer that it was Det. Muzupappa who told Lagina in a threatening manner during this second interview, "come on, think about your job, think about your son." R. 369-70. A rational jury could also infer that it was Det. Muzupappa who told Lagina that she was still being held for questioning when she asked how long it was going to be because she had to go to work, then called her job and told them as much. R. 370-71. For his part, Det. Muzupappa testified that Lagina asked to make a phone call and was allowed to call her job. R. 482-83. However, the jury was not required to credit his testimony. Rather the jury could have inferred that it was Det. Muzupappa who Lagina told, "I'm ready to go home," and Det. Muzupappa who responded, "we can hold you up to 72 hours," while Deshaun cried and was shaky, cold, and nervous. R. 372-74. A rational jury could infer that it was Det. Muzupappa who locked Lagina and her son in a room. R. 375. Jennifer testified that "I saw Lagina and her son, Deshaun, get took into a room." R. 1178. Mary also testified that she saw someone take Lagina and her son into a room. R. 864. Lagina banged on the door. R. 376.

After Lagina witnessed a detective smack the back of her sister Carrie's chair, Lagina was returned to the room and made a series of phone calls for help and to inform the shuttle driver that she would not be able to make it to work. R. 377-85. Plaintiffs' Exhibit No. 2 corroborates Lagina's testimony that she made phone calls at 3:06 a.m., 3:07 a.m., 3:13 a.m., 3:14 a.m., 4:17 a.m., 5:04 a.m., 5:44 a.m., 6:03 a.m., 6:36 a.m., 6:49 a.m., and 6:51 a.m. that night. R. 382-85, Plaintiffs' Exhibit No. 2. Despite this, Det. Muzupappa testified that he never saw Lagina on her cell phone although, according to him, he spent a large portion of the night

with all the girls, including Lagina. R. 540-41. Det. Lymperis also testified that she did not see any of the girls using a cell phone although she spent several hours with the girls. R. 803-04. A reasonable jury may not have found Det. Muzupappa's testimony credible. A reasonable jury could conclude that if Det. Muzupappa was actually with Lagina for most of the night, then he would have seen her make at least some of the 11 phone calls from her cell phone. A reasonable jury could credit Lagina's testimony over Det. Muzupappa's, concluding that Det. Muzupappa did not see Lagina make any of the 11 phone calls because Det. Muzupappa had locked Lagina and Deshaun in a room.

Det. Muzupappa testified that from 1 a.m. to 6 a.m., he made sure that the plaintiffs were not getting up and walking around the police station. R. 491, 508-09. Det. Muzupappa testified that, "for a large portion of the night, we were just, for lack of a better word, hanging out back there with them . . . [w]e would bring them whatever they needed. If they needed to go to the washroom, somebody would take them to the washroom." R. 513. Det. Muzupappa explained that witnesses cannot move around without being escorted by a detective. R. 491. If witnesses needed food or water, they are dependent upon a detective to get it. R. 491. Furthermore, Det. Det. Muzupappa never told any of the plaintiffs that they were free to leave. R. 495. In fact, Det. Muzupappa admitted that he has locked witnesses in rooms before. R. 496. A reasonable jury could have concluded that Detective Muzupappa intended to communicate to a reasonable person in Lagina's and Deshaun's situation that s/he was not free to leave when Det. Muzupappa told Lagina what to do, controlled Lagina and Deshaun's movements, threatened Lagina, called her job and told them she was being held for questioning, told Lagina she could be held for up to 72 hours, stood guard over them, and locked Lagina and Deshaun in a room.

Defendants contend that Deshaun was not entitled to damages because there was no evidence to support his damages claim. This unsupported argument is without merit. First, it is important to note that Defendants have not sought remittance of the jury's award. Such a request would have had to have been brought pursuant to Federal Rule of Civil Procedure 59 as a request to "alter or amend" a judgment. Defendants would have also been required to actually request remittitur in their post-trial motion. Defendants did neither. Nor could they in a motion under Federal Rule of Civil Procedure 50, as that Rule is reserved for arguments presented to the Court before verdict, which may then be renewed after the verdict. Fed. R. Civ. P. 50(a) & 50(b). Defendants cannot seek to amend a judgment via remittitur in a motion under Rule 50. Nor may

they include such an argument in reply, because the time to raise arguments under Federal Rule of Civil Procedure 59 has long since expired.

Rather, Defendants' only argument is that, as a matter of law, Deshaun is only entitled to nominal damages because he did not prove any actual injury. Def. Mot. at 10. This argument fails. Contrary to Defendants' assertion, Lagina need not explain why Deshaun was "crying, shaky, cold and nervous" at the police station. *Id.* The jury can reasonably infer from the evidence that the reason Deshaun was crying, shaky, cold and nervous at the police station was because he was locked in a room in violation of the constitution. Moreover, the fact that Deshaun was crying, shaky, cold and nervous during his detention as an eight year-old boy at the police station establishes that he was, in fact, damaged by his ordeal. A rational jury is further entitled to infer that being locked in a room at a police station for hours in the dead of night was especially traumatizing for an eight-year-old child. The jury might have also shared Deshaun's mother's concern about how this incident would have affected Deshaun's perception of police officers in the years following his detention. R. 389-90. Emotional damages do not have to be supported my medical testimony in order to support an award of compensatory damages. *See, e.g.*, *O'Sullivan v. City of Chicago*, 474 F.Supp.2d 971, 988 (N.D.Ill. 2007) (rejecting requirement that plaintiff had to corroborate emotional harm with medical testimony); *see also Redmond v. Goosherst*, 2008 WL 3823099, at *3 (N.D. Ill. August 12, 2008) (damages award appropriate despite lack of physical injury or medical treatment). The evidence was more than sufficient to support an award of damages to Deshaun.

### D. A Reasonable Jury Could Have Concluded That Detective Kischner's Actions Would Have Caused A Reasonable Person in Latoya Powell's Situation To Believe That She Was Not Free To Leave

Sufficient evidence existed for a reasonable jury to find that Det. Kischner unlawfully detained Latoya. Latoya had just witnessed a traumatic event when she came to the police station. Although the Defendants maintained she was at the station voluntarily, she was so scared when she came to the station that she lied about her identity. R. 1016-17.

Det. Kischner testified that he questioned Latoya. R. 965-66. Det. Kischner testified that he interviewed Latoya at 12:15 a.m. and it was only he, Latoya, and Det. Velazquez in the room. R. 912. In that first interview, Latoya asked if she could go home and was told no. R. 1016, 1018-19. She was also told that she could be held for 72 hours. *Id.* Thus, a rational jury could

infer that it was Det. Kischner who told Latoya that she could not leave. In fact, Det. Kischner admitted that he never told Latoya that she was free to go. R. 945. A rational jury could infer that it was Det. Kischner who, after this interview, locked Latoya in a holding cell, where she banged on the door, kicked the door, and hollered in an attempt to get out. R. 1020.

Det. Kischner and Latoya agreed that she was interviewed a second time and that during this second interview, Latoya was asked again about a gun. R. 922, 1024. Likewise, there was no dispute that it was Det. Kischner who had Latoya sign the General Progress Report. R. 933, 935, 985. Latoya testified, "I was told if I signed it, you can go home." R. 1025. Latoya testified that she was upset "'Cause I was ready to go home." R. 1027. However, Latoya did not go home. Rather, she went back into the locked holding cell and banged and kicked the door in an attempt to get out. R. 1028. Latoya testified that she eventually went back out into the open area because "[t]hat's where they told me to go." R. 1029.

Det. Kischner also testified that he was on the floor with the Plaintiffs and observed them while there. R. 991, 993-94. Det. Kischner testified that he does not let people walk more than a few feet by themselves on the floor, and even then, he would watch them the entire time. R. 948-49. Det. Kischner testified that he would not have allowed Plaintiffs to walk to the bathroom by themselves. R. 949. In fact, Det. Kischner agreed that at his deposition, he testified, "If they would have got up and just started walking around the floor, somebody would have probably told them you just can't walk around the floor, hon." R. 951. A reasonable jury could have inferred that Det. Kischner denied Latoya's requests to go home, used her desire to go home to coerce her into signing a written statement, restricted her movement and locked her in a room in a show of authority intended to communicate to a reasonable person in Latoya's situation that she was not free to leave. Latoya, in turn, yielded to this show of authority and stayed at the police station against her will.

### E. A Reasonable Jury Could Have Concluded That The Actions of Detectives Allen and Lymperis Would Have Caused A Reasonable Person in Jalessa Bonner's Situation To Believe That She Was Not Free To Leave

At trial, Plaintiffs presented sufficient evidence for a reasonable jury to conclude that a reasonable person in Jalessa's situation would not believe she was free to leave during her detention at the police station. Jalessa was a fourteen year-old girl who had just witnessed a traumatic event when she came to the police station.

During Plaintiffs' case in chief, Det. Allen testified that he sat right next to Jalessa for four hours to make sure she did not leave. R. 284, 291. Defendants may complain that Det. Allen later contradicted himself, but a reasonable jury could, and did, choose to credit his earlier testimony over his later testimony. Det. Allen also testified that he transported fourteen-year-old Jalessa four miles from where she lived to the police station around midnight, then escorted her into the police station via a back, non-public entrance. R. 272, 274, 293, 316. Jalessa testified that immediately after being escorted through the back entrance, she was told to sit down in the open area. R. 695. The jury could have reasonably inferred that it was Det. Allen who told her to sit down because he was the one who escorted her into the police station.

In addition, Jalessa testified that the detective who interviewed her lied to her that he had called her mother and grandmother and that they were en route to the police station. R. 277, 696, 708, 783, 785. Detectives Allen and Lymperis confirmed that it was Allen who interviewed her, and thus a jury may infer that it was he who lied to Jalessa. R. 277, 783, 785. When Jalessa was finally permitted to go home, she discovered that her grandmother had no idea where she had been all night. R. 708. Indeed, although Det. Allen had Jalessa's mother's and grandmother's phone numbers, he admitted that he never called anyone to let them know Jalessa was safe. R. 280-81. Det. Allen further testified that he never told Jalessa she was free to go. R. 284.

Similarly, sufficient evidence existed for a reasonable jury to find that Detective Lymperis unlawfully detained Jalessa. It is Det. Lymperis' own testimony that would allow a reasonable jury to conclude that she spent several hours carefully monitoring and controlling the girls' movements. R. 792, 796 (testifying that she spent several hours sitting with the Plaintiffs). Det. Lymperis testified that, while she would permit the girls to wander between the Special Victims Unit offices, she would not allow them to go beyond that area and into the open area of the police station by themselves. R. 802. Similarly, Det. Lymperis testified that the girls would have needed a law enforcement officer's assistance to get food or water, since she would not have allowed them to walk to get it themselves. R. 803. Jalessa merely confirmed Det. Lymperis' own testimony when she testified that she did not see any civilians walking around without a law enforcement officer. R. 705. Restricting the girls' movements apparently required all of Det. Lymperis' attention as she did not work on any other case during the time she was with the Plaintiffs. R. 795. Det. Lymperis further caused Jalessa to yield to her authority by questioning her in such an aggressive manner that it made Jalessa nervous. R. 699-700, 704. In

addition, Det. Lymperis did not tell Jalessa at any time that she was free to leave, did not call Jalessa's mother or grandmother although she had their phone numbers, and did not offer Jalessa a ride home although, Jalessa, as a fourteen-year-old girl, could not drive the four miles back to her grandmother's house. R. 792, 795-96, 802, 808-09. A reasonable jury could conclude that the Detectives were aggressive towards Jalessa and stood guard over Jalessa for hours in a show of authority intended to communicate to a reasonable person in Jalessa's position that she was not at liberty to leave.

Lastly, in an undeveloped aside, Defendants suggest that there was insufficient evidence to support the jury's award of damages to Jalessa. Again, the Defendants do not seek remittitur, but contend that Jalessa's award is not supported by the evidence because other Plaintiffs sought medical treatment for their injuries but were awarded less damages. Obviously, the jury was able to conclude that the effect of the misconduct against Jalessa was more damaging because of her young age. Jalessa had to sit in the station, knowing that her aunt was locked in a cell despite the fact that neither of them had done anything wrong. R. 703. Jalessa testified of her ordeal, "It felt hurtful and bad because my mom didn't know where I was, anything could have happened, and it's just so hard. It was painful." R. 709. The jury was also entitled to take into account the fact that Jalessa was already traumatized when she arrived in the police station in assessing the emotional harm caused her when the detectives imprisoned her.

A rational jury could have inferred that it must have been terrifying for a fourteen-year-old girl to have been forcibly taken to the police station after having just been shot at, then interrogated twice by officers who constantly monitored her movements all while she could hear her friends and loved ones banging on doors and urgently yelling to be let out. The evidence was sufficient to support the award of damages to Jalessa.

### F. A Reasonable Jury Could Have Concluded That Detective Lymperis' Actions Would Have Caused A Reasonable Person in Mary Bonner's Situation To Believe That She Was Not Free To Leave

It is undisputed that Mary Bonner had just witnessed a traumatic event when she came to the police station. After the shooting, she was the most upset by it. R. 1166. She was questioned by Det. Lymperis at the station.

Det. Lymperis testified that she questioned Mary by herself, then told Mary she could go sit with her friends. R. 774, 778-79, 832. Det. Lymperis testified that she spent several hours

sitting with the Plaintiffs. R. 792, 796. But Mary contradicted that testimony. Mary testified that she was locked in a cell, where she was "kicking and banging and saying, 'Let me out. Let me out.'" R. 867-68, 899. Mary eventually stopped banging on the door and sat on a bench "[l]ong enough to when I got up my butt was numb." R. 869-70. Mary testified that she only left that room when "[t]hey finally took me to the washroom." R. 870.

As explained above, Det. Lymperis' testimony would lead a reasonable jury to conclude that she spent several hours carefully monitoring and controlling the girls' movements, including Mary's, and that Mary would not have felt free to leave. *Id.* Indeed, a reasonable jury could infer that Det. Lymperis lied about being with Mary while Mary was locked in the cell because she was one of the detectives ensuring that Mary would not feel free to leave.

In three sentences, Defendants backhandedly suggest that there was insufficient evidence to support the jury's award of damages to Mary. Again, the Defendants do not seek remittitur, but contend that Mary's award is not supported by the evidence because other Plaintiffs sought medical treatment for their injuries but were awarded less damages. Defendants cite no case law for the proposition that a plaintiff has to present medical evidence (or evidence of medical treatment) to have been emotionally damaged. *See, e.g., O'Sullivan v. City of Chicago*, 474 F.Supp.2d 971, 988 (N.D.Ill. 2007) (rejecting requirement that plaintiff had to corroborate emotional harm with medical testimony); *see also Redmond v. Goosherst*, 2008 WL 3823099, at *3 (N.D. Ill. August 12, 2008) (damages award appropriate despite lack of physical injury or medical treatment). Such an argument is not only counter to the law, it is counter to common sense. Mary was nineteen years-old and responsible for her fourteen year-old cousin. Mary had just witnessed a traumatizing event when she was then held against her will at the police station in a locked room. Mary testified about being taken from her one year-old baby all night, coming home, holding her baby and "crying, still crying." R. 874-75. Certainly, a jury could infer from these facts that Mary suffered damages as a result of her ordeal.

### G. A Reasonable Jury Could Have Concluded That Detectives Schalk and Bogucki's Actions Would Have Caused A Reasonable Person in Plaintiffs' Situation To Believe That She Was Not Free To Leave

Sufficient evidence existed for a reasonable jury to find that Dets. Schalk and Bogucki unlawfully detained Plaintiffs. Dets Schalk and Bogucki were in charge of the initial investigation that night. R. 648, 1537, 1668. They had "overall responsibility for the entire

investigation." R. 1702.  The other detectives were reporting to Schalk and Bogucki on the
results of their investigation.  R. 664-65, 1477-80, 1483-84, 1519, 1669.

Det. Schalk testified that civilians cannot freely wander around the second floor of Area
5. R. 632. Det. Bogucki agreed. R. 1605. In fact, if he had seen people walking around, he would
have stopped them. R. 1606. Det. Bogucki knew that there were minors at the police station, but
did not ensure that their parents had been notified. R. 1527.  Det. Schalk knew the plaintiffs had
been there for hours, but he did not offer them a ride home. R. 636. These detectives did not tell
Plaintiffs that they could leave until 8 a.m.  R. 1522. Dets. Schalk and Bogucki testified that they
asked all of the girls to stay longer at 4 a.m.  R. 633-34, 1529-30.  However, Carrie, Lagina, and
Jennifer testified that that never happened.  R. 185, 371, 1184.

A reasonable jury could have chosen to credit their testimony over the detectives,
meaning that Schalk and Bogucki lied to the jury about ascertaining whether Plaintiffs wanted to
leave and then falsely reported that Plaintiffs agreed to stay.  The fact that Schalk and Bogucki
lied about a central point to the parties' claims evinced a guilty conscience on their part.  A
reasonable inference is that the detectives who were in charge of the investigation (and the
roundtable that was to be convened later that morning) lied to the jury about Plaintiffs wanting to
stay because they had first-hand knowledge that the Plaintiffs did not want to stay from their
personal involvement in detaining Plaintiffs.

To reach an opposite conclusion would require this Court to impermissibly construe the
facts in the light most favorable to Defendants.  This Court would have to conclude that despite
being in charge of the investigation, despite being at the police station from 2 a.m. to after 8 a.m.,
these detectives were the unwitting stooges of some rogue detectives who were locking
witnesses from their cases into rooms. *See* R. 1596 (Bogucki denies seeing or hearing any
person locked in a room).

## CONCLUSION

This Court should deny Defendants' Joint Rule 50(b) Motion For Judgment as a
Matter of Law because a reasonable jury could have, and did, find that the defendant and
non-defendant Detectives unlawfully and unreasonably detained the plaintiffs – including
an eight-year-old child, a pregnant teenager, and a fourteen-year-old girl – for more than
eight hours overnight in violation of the Fourth Amendment and 42 U.S.C. §1983.

RESPECTFULLY SUBMITTED,

S/Russell Ainsworth
Attorneys for Plaintiffs

Arthur Loevy
Jon Loevy
Russell Ainsworth
Tara Thompson
Michaele Turnage Young
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Russell Ainsworth, an attorney, certify that on August 24, 2009 I delivered by electronic means a copy of the attached Response to all counsel of record.

S/Russell Ainsworth