9

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**CARRIE WARFIELD, LAGINA WARFIELD, individually and on behalf of her minor son, DESHAUN FOX, JENNIFER WARFIELD, LATOYA POWELL, MARY BONNER, and JALESSA BONNER,**

**Plaintiffs,**

**v.**

**CITY OF CHICAGO, et al.,**
**Defendants.**

**No. 05 C 3712**

**Judge Ruben Castillo**

## MEMORANDUM OPINION AND ORDER[1]

Carrie Warfield ("Carrie"), Lagina Warfield ("Lagina") on behalf of herself and her minor son Deshaun Fox ("Deshaun"), Jennifer Warfield ("Jennifer"), Latoya Powell ("Latoya"), Mary Bonner ("Mary"), and Jalessa Bonner ("Jalessa") (collectively, "Plaintiffs"), brought this unlawful detention suit pursuant to 42 U.S.C. § 1983 ("Section 1983") against the City of Chicago (the "City"), and Chicago police detectives Raymond Schalk ("Schalk"), Jerome Bogucki ("Bogucki"), Michael Muzupappa ("Muzupappa"), and Bruce Kischner ("Kischner") (collectively, "Defendants").[2] (R. 64, Compl.) On July 23, 2009, following a two and a half week trial, the jury entered a verdict in favor of Plaintiffs. (R. 424, Entered Judgment.)

---

[1] The background facts underlying this case have been set forth in this Court's prior opinion and will not be repeated here. *See Warfield v. City of Chicago*, 565 F. Supp. 2d 948 (N.D. Ill. 2008).

[2] Plaintiffs' complaint contained eight counts against ten individual defendants and the City of Chicago. However, after the Court's summary judgment opinion and Plaintiffs' voluntary dismissals, Detectives Antonio Allen ("Allen"), John Hillmann ("Hillmann"), Valeric Lymperis ("Lymperis"), and Alan Pergande ("Pergande") (collectively, "Dismissed Defendants") were dismissed, and only the unlawful detention claim against the above named Defendants proceeded to trial. (*See Warfield*, 565 F. Supp. 2d at 948 & R. 195-1, Pls.' Opp'n to Summ. J. at 18.)

Specifically, the jury found as follows:

- In favor of Carrie and against Schalk, Bogucki and Pergande in the amount of $9,000 in compensatory damages, $500 in punitive damages as to Schalk, and $500 in punitive damages as to Bogucki. The jury found against Carrie and for Muzupappa, Kischner, Allen, Lymperis and Hillmann.
- In favor of Lagina and against Schalk, Bogucki and Muzupappa in the amount of $20,000 in compensatory damages, $15,000 in punitive damages as to Schalk, and $15,000 in punitive damages as to Bogucki. The jury found against Lagina and for Kischner, Allen, Lymperis, Hillmann and Pergande.
- In favor of Deshaun and against Schalk, Bogucki and Muzupappa in the amount of $25,000 in compensatory damages, $20,000 in punitive damages as to Schalk, and $20,000 in punitive damages as to Bogucki. The jury found against Deshaun and for Kischner, Allen, Lymperis, Hillmann and Pergande.
- In favor of Jennifer and against Schalk, Bogucki and Hillmann in the amount of $2.00 in compensatory damages, $250 in punitive damages as to Schalk and $250 in punitive damages as to Bogucki. The jury found against Jennifer and for Muzupappa, Kischner, Allen, Lymperis and Pergande.
- In favor of Latoya and against Schalk, Bogucki and Kischner in the amount of $2.00 in compensatory damages, $310 in punitive damages as to Schalk and $310 in punitive damages as to Bogucki. The jury found against Latoya and for Muzupappa, Allen, Lymperis, Hillmann and Pergande.
- In favor of Mary and against Schalk, Bogucki and Lymperis in the amount of

$15,000 in compensatory damages, $10,000 in punitive damages as to Schalk and $10,000 in punitive damages as to Bogucki. The jury found against Mary and for Muzupappa, Kischner, Allen, Hillmann and Pergande.

- In favor of Jalessa and against Schalk, Bogucki, Allen and Lymperis in the amount of $40,000 in compensatory damages, $20,000 in punitive damages as to Schalk and $20,000 in punitive damages as to Bogucki. The jury found against Jalessa and for Muzupappa, Kischner, Hillmann and Pergande.

(*Id.*)

Currently before the Court are Defendants' motions for a new trial and for judgment as a matter of law pursuant to Federal Rules of Civil Procedure 50 and 59(a). (R. 427, Defs.' Mot. for New Trial; R. 428 Defs.' Mot. for J. as a Matter of Law.) For the following reasons, the motions are denied.

**I. Motion for New Trial**

Defendants argue that they are entitled to a new trial pursuant to Rule 59(a) for the following reasons: "(1) Plaintiffs' *Batson* challenge was erroneously upheld and the juror in question was impaneled; (2) Defendants' motion to strike a juror for cause was denied and Defendants were forced to use one of their peremptory challenges; (3) Plaintiffs' proposed jury instruction defining "unlawful detention" was given over Defendants' objection and in lieu of Defendants' proposed instruction; (4) Defendants' proposed instruction taken from *Hall v. Bates* was not given; (5) the Court's response to the jury's first question to the Court was insufficient; (6) allowing in hearsay evidence and evidence that should have been barred by this Court's orders on motions *in limine*; and (7) allowing Plaintiffs' counsel to make inflammatory and

prejudicial remarks during closing argument." (R. 427, Defs.' Mot. for New Trial at 1.)

## LEGAL STANDARD

Under Rule 59, the Court may grant a new trial after a jury trial "for any reason which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59(a). However, a new trial should be granted "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the Court's] conscience." *Davis v. Wis. Dep't of Corr.*, 445 F.3d 971, 979 (7th Cir. 2006) (internal citations omitted).

## ANALYSIS

### A. Errors in Jury Selection

Defendants first argue that they are entitled to a new trial because of errors in the jury selection process. (R. 427, Defs.' Mot. for New Trial at 2-5.) Defendants claim that the Court erred in sustaining Plaintiffs' *Batson* challenge, refusing to strike Juror No. 12 and denying their attempt to strike Juror No. 13 for cause. (*Id.*)

#### 1. The *Batson* Challenge

*Batson* provides a three-step inquiry to determine whether a peremptory challenge was based on race: (1) the opponent of the peremptory challenge must make a prima facie showing that the challenge was exercised on the basis of race; (2) if the showing is made, the burden shifts to the proponent of the challenge to offer a race-neutral explanation for striking the juror in question; and (3) the trial court must then determine whether the opponent of the peremptory challenge has shown purposeful discrimination. *Batson v. Kentucky*, 476 U.S. 79, 97-98 (1986); *see also Rice v. Collins*, 546 U.S. 333, 338 (2006). At the beginning of the trial on July 10, 2009,

Defendants filed a motion for reconsideration of the *Batson* challenge arguing that this procedure had not been followed. (R. 403, Defs.' Mot. for Recons.) After a careful review, however, the Court denied this motion stating that we were comfortable that we followed the proper *Batson* procedure. (R. 436, Defs.' New Trial Reply, Ex. A. Tr. at 684:25-685:12.) Defendants once again argue that the Court did not appropriately follow *Batson*. (R. 427, Defs.' Mot. for New Trial at 4.)

Defendants first claim that Plaintiffs did not make a prima facie showing to satisfy the first step of the *Batson* analysis. (*Id.*) To satisfy this step, "the burden is low, requiring only circumstances raising a suspicion that discrimination occurred . . . ." *United States v. Hendrix*, 509 F.3d 363, 370 (7th Cir. 2007). In this case, Plaintiffs were all visible racial minorities and Defendants were not visible racial minorities. During voir dire, three of the fourteen prospective jurors were visible racial minorities. Defendants exercised challenges on two of these three minorities and Plaintiffs responded with the *Batson* challenge. The Court found that given the circumstances of this case, Plaintiffs raised a suspicion of discrimination. *See Batson*, 476 U.S. at 97 ("a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination").

The burden then shifted to Defendants to come forward with a race-neutral explanation for challenging the black jurors. *See id.*; *see also United States v. George*, 363 F.3d 666, 674 (7th Cir. 2004) ("the [] proffered reason for the strike need not be particularly persuasive or even based on quantifiable data, so long as it is not pretextual.") In response to the Court's inquiry, Defendants stated that this is a case against Chicago Police officers and they were striking Juror No. 12 because she had an arrest in 2000 for disorderly conduct by the Chicago Police

Department. (R. 427, Defs.' Mot. for New Trial, Ex. A. July 6, 2009 Tr. at 118:7-20.) However, when questioned about the incident, Juror No. 12 indicated that she was treated fairly by the police officer and that she was in fact being "disorderly." (R. 403, Defs.' Mot. for Recons., Ex. A. July 6, 2009 Tr. at 108:16-109:4.) Moreover, Juror No. 12 stated that the arrest would not affect her ability to be fair and impartial. (*Id.*)

In the final step of the *Batson* analysis, the Court sustained the challenge, finding that given Juror No. 12's response to the disorderly conduct incident, Defendants' proffered reason was pretextual.[3] As such, the Court properly followed the three-step *Batson* inquiry and did not err.

**2. For Cause Strike**

Defendants also argue that the Court erred in denying their attempt to strike Juror No. 13 for cause and that this error denied Defendants the right to a fair trial. (R. 427, Defs.' Mot. for New Trial at 5.) If a trial judge determines that a potential juror cannot render impartial jury service, the judge should dismiss the juror for cause. *United States v. Brodnicki*, 516 F.3d 570, 575 (7th Cir. 2008). The trial judge has the "opportunity to assess the credibility and demeanor of the potential jurors during voir dire"; therefore, the judge's ruling with respect to a challenge for cause is given deference. *Id.* In this case, Juror No. 13 stated in voir dire that he had a lawsuit pending against another municipality but it "had nothing to do with [the nature of the present case]" and that he "most certainly" could be fair and impartial. (*Id.*, Ex. A. July 6, 2009

[3] Defendants argue that the Court did not determine whether the race-neutral explanation was pretextual. (R. 427, Defs.' Mot. for New Trial at 4.) Although the Court's prior ruling was proper, we will oblige Defendants and at this time explicitly state that the July 6, 2009 *Batson* challenge was sustained because the proffered explanation was pretextual and evinced a discriminatory intent.

Tr. at 98-99.) Defendants moved to strike Juror No. 13 for cause because of the lawsuit, but the Court denied the motion. (*Id.* at 116:8-117:2.) Defendants claim that they were then "forc[ed] to use one of their peremptory challenges to strike Juror No. 13" and that based on this error, they are entitled to a new trial.[4] (*Id.* at 5.)

To begin, Juror No. 13 unequivocally indicated that he could be fair and impartial in this case and this Court accepted this assertion as true. As such, there was no error. *See Brodnicki*, 516 F.3d at 575 (determining that there was no error in the trial judge's refusal to dismiss a juror for cause when the judge received an affirmative response that the juror could be fair and impartial and there was no reason to believe otherwise). Moreover, when a juror whose voir dire is challenged does not sit on the jury, the defendant is "not deprived of any rule-based or constitutional right." *Id.*; *see also United States v. Polichemi*, 219 F.3d 698, 704-05 (7th Cir. 2000) (the Seventh Circuit determined that where a district court should have excused a juror for cause, but the juror is excused through a peremptory strike, the error in failing to excuse the juror does not call into question the impartiality of the jury ultimately selected). Juror No. 13 was not ultimately impaneled on the jury. Therefore, Defendants did not suffer a deprivation of rights and their motion is denied on this basis.

**B. Errors in Jury Instructions**

Next, Defendants claim that they are entitled to a new trial due to errors in the jury

---

[4] Defendants also claim that Plaintiffs' motion to strike Juror No. 45 for cause "was met with a different response" and illustrates a "disparity" in this Court's rulings. (*Id.*; R, 436, Defs.' Reply at 2.) However, Juror No. 45's sister was a lawyer for the City that worked in the same unit as Defendants' counsel. (R. 427, Defs.' Mot. for New Trial, Ex. A. July 6, 2009 Tr. at 92:15-93:6.) Moreover, the Court excused her after noting she was second to last in the pool of potential jurors and would not be impaneled on the jury. (*Id.*)

instructions. (R. 427, Defs.' Mot. for New Trial at 5-9.) Specifically, Defendants claim that the Court erred in giving Plaintiffs' jury instruction No. 21 ("Instruction No. 21") and "compounded" the error by refusing to give Defendants' proposed jury instruction No. 11. (*Id.* at 5-8.) Further, Defendants claim that the Court failed to direct the jury to Defendants' instruction No. 9 in response to the first jury question. (*Id.* at 9.)

A district court has "substantial discretion" to formulate jury instructions "so long as [they] represent [] a complete and correct statement of the law." *United States v. Noel*, 581 F.3d 490, 499 (7th Cir. 2009) (quoting *United States v. Matthews*, 505 F.3d 698, 704 (7th Cir. 2007). "In order to receive a new trial based on erroneous instructions, a defendant 'must show both that the instruction did not adequately state the law and that the error was prejudicial to [him] because the jury was likely to be confused or misled.'" *United States v. White*, 443 F.3d 582, 587 (7th Cir. 2006) (quoting *United States v. Smith*, 415 F.3d 682, 688 (7th Cir. 2005)); *see also Lasley v. Moss*, 500 F.3d 586, 589 (7th Cir. 2007) (quoting *Doe v. Burnham*, 6 F.3d 476, 479 (7th Cir. 1993) (reversal is justified "only if the instruction misguides the jury so much that a litigant is prejudiced")). When assessing whether prejudice has resulted, the Court must consider the instructions as a whole, along with all the evidence and arguments in the case, and then decide whether the jury was misinformed about the applicable law. *Id.* at 587-88. Here, the Court gave Instruction No. 21, which provided a definition of "detained." (R. 427, Defs.' Mot. for New Trial, Ex. B. Instruction No. 21.) Defendants argue that in contrast to their proposed instruction No. 8, Instruction No. 21 "did not adequately state the law because it did not set forth what constitutes a seizure for Fourth Amendment purposes." (*Id.* at 6.)

Under the applicable law, "[i]n order to establish that [defendant's] actions constituted a

'seizure,' the plaintiffs must demonstrate, from all the circumstances surrounding the incident, that a reasonable person in such a situation would have believed that he was not free to leave." *Belcher v. Norton*, 497 F.3d 742, 747-48 (7th Cir. 2007) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Instruction No. 21 provided: "A person has been detained if a reasonable person in that position would not feel free to disregard the police and go about his or her business. The determination of whether someone has been detained is made on the basis of all relevant circumstances." (*Id.*, Ex. B. Instruction No. 21.) This Court finds that Instruction No. 21 adequately states the applicable law.[5]

The Seventh Circuit has indicated "relevant factors" that are helpful in the "highly fact-bound inquiry" into whether a seizure has occurred. *See, e.g., United States v. Tyler*, 512 F.3d 405, 410 (7th Cir. 2008). In addition to providing specific factual circumstances, the court stated that a seizure is indicated by "coercive conduct on the part of the police that indicates that cooperation is required." *Id.* Instruction No. 21 provides a list of ten factors "that may be considered," when determining if a person has been detained in violation of the Fourth Amendment. (R. 427, Defs.' Mot. for New Trial, Ex. B. Instruction No. 21.) Defendants argue that this list gave the jury the impression that it was "exhaustive." (*Id.* at 7.) However, Instruction No. 21 explicitly states that a determination "is made on the basis of all relevant circumstances" and the circumstances the jury may consider "are not limited to" those listed.

---

[5] Defendants also argue that the Court erred by refusing their proposed jury instruction No. 11. (R. 427, Defs.' Mot. for New Trial at 8.) Again, this Court finds that the instructions given to the jury were an accurate statement of the law, therefore the Court was under no obligation to provide Defendants' proposed instruction. *See Lasley*, 500 F.3d at 589 ("A district court is not required to issue a perfect set of jury instructions; however, the issued instructions must be correct legal statements and must convey the relevant legal principles in full.").

(*Id.*, Ex. B. Instruction No. 21.) Therefore, the list in Instruction No. 21 did not give the jury the impression that it was "exhaustive."

Defendants also argue that the factors listed in Instruction No. 21 are not supported by case law. (*Id.* at 6-7.) However, all of the factors listed in Instruction No. 21 describe coercive conduct by the police which would indicate that cooperation is required. *See Tyler*, 512 F.3d at 410. Indeed, half of the factors were also included in Defendants' proposed instruction No. 8. (*See* R. 427, Defs.' Mot. for New Trial, Ex. B. Instruction No. 21 & Ex. C, Defs.' Proposed Jury Instruction No. 8.) Moreover, several factors were specifically addressed in other cases. *See Doe v. Heck*, 327 F.3d 492, 510 (7th Cir. 2003) (where the age of the person was a relevant consideration); *United States v. Scheets*, 188 F.3d 829, 837 (7th Cir. 1999) (whether the person was removed to another area was an appropriate consideration); *United States v. Borys*, 766 F.2d 304, 309-311 (7th Cir. 1985) (where the court considered physical surroundings of the encounter and the length of detention). Accordingly, Defendants have not demonstrated the inadequacy of the instruction given to the jury and a new trial is not warranted based on the challenged instructions.[6]

Finally, Defendants argue that the Court erred by refusing to direct the jury to Defendants' instruction No. 9 after the first jury question. (R. 427, Defs.' Mot. for New Trial at 8-9.) During deliberations, the jury sent a note to the Court which stated: "We are having a problem with some jurors having a different definition of what unlawful detention is; one juror feels that they were held but not unlawfully detained. Therefore, we need clarification as to

---

[6] Consequently, the Court need not address the issue of whether Defendants suffered prejudice. *See White*, 443 F.3d at 587.

where it becomes unlawful detention." (*Id.*, Ex. E, Jury Note.) The Court provided a response reminding the jurors to follow all of the given instructions, and particularly referenced the text of Instruction No. 21. (*Id.*, Ex. F, Court's Resp.) Defendants argue the Court erred by failing to also direct the jury to Defendants' instruction No. 9.[7] (*Id.* at 9.)

A district court has "broad discretion" in determining how best to respond to a question from the jury. *United States v. He*, 245 F.3d 954, 960 (7th Cir. 2001). "[I]f the answer was adequately provided in previous instructions, the court might choose simply to refer the jury back to those instructions for guidance." *Id.*; *see also Emerson v. Shaw*, 575 F.3d 680, 685 (7th Cir. 2009) ("We have repeatedly held that judges are well within their discretion to refer a jury back to the original instructions when the jury evinces possible confusion.") Here, the jury asked for a definition of "unlawful detention" and the Court responded by referring them back to the original instructions, including a definition of "detained." (R. 427, Defs.' Mot. for New Trial, Exs. E & F.) The Court's original instructions correctly stated the applicable law, therefore there was no error. *See He*, 245 F.3d at 960. Accordingly, Defendants' motion for a new trial on this basis is denied.

**C. Errors in Evidentiary Rulings**

Next, Defendants argue that they are entitled to a new trial based on errors in evidentiary rulings. (R. 427, Defs.' Mot. for New Trial at 9-13.) A new trial based on an error in the admission of evidence is granted only in "extraordinary situations." *Schick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 611 (7th Cir. 2002). The Seventh Circuit has stated that "[a] court

---

[7] Instruction No. 9 was titled "Free to Leave" and provided: "While you may consider whether a witness was advised that he was free to leave, there is no constitutional or other legal mandate to give such warnings." (*Id.*, Ex. G, Instruction No. 9.)

should only grant a new trial if the improperly admitted evidence had 'a substantial influence over the jury,' and the result reached was 'inconsistent with substantial justice.'" *Id.* (quoting *Agushi v. Duerr*, 196 F.3d 754, 759 (7th Cir. 1999)). Evidentiary errors satisfy this standard "only if a significant chance exists that they affected the outcome of the trial." *Id.* (quoting *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1048 (7th Cir. 2000)). Defendants argue that this standard is met based on four different evidentiary errors by the Court: (1) allowing hearsay evidence regarding Lagina's testimony as to why she called her boyfriend, family and the news station; (2) allowing evidence that Plaintiffs were "shot at"; (3) not allowing Defendants to introduce evidence of Seneca Smith's ("Smith's") conviction; and (4) allowing Sgt. Joseph Moseley ("Sgt. Moseley") to testify and Plaintiffs to include this testimony in their argument. (R. 427, Defs.' Mot. for New Trial at 9-13.)

**1. Lagina's Testimony**

Prior to trial, in Motion in Limine No. 8, Defendants moved to bar the content of telephone conversations Lagina had with various individuals at the police station as hearsay. (R. 258, Defs.' Motion in Limine No. 8 at 2.) In their motion, Defendants stated that they believed Plaintiffs may solicit testimony from Lagina "that the police brought Plaintiffs to the station, wouldn't let them leave, that Plaintiffs were being harassed, and that Lagina's son was scared." (*Id.* at 2.) The Court granted the motion, in part, finding that the fact that the telephone conversations were made was admissible, but that the substance of the calls was inadmissable.[8]

[8] The Court stated that this ruling was subject to modification at trial if Defendants argued that Lagina fabricated her account of mistreatment by police after the fact. (R. 348, Order at 3-4.) In that event, the conversations could be admissible under Federal Rule of Evidence 801. (*Id.* at 4.)

(R. 348, Order at 3-4.) During the trial, Plaintiffs clarified that they intended to have Lagina testify that she made certain calls at the police station and to ask her "why she wanted to make those calls." (R. 427, Defs.' Mot. for New Trial, Ex. A. Tr. at 323:14-18.) Plaintiffs argued that this would not be barred under Motion in Limine No. 8 because the testimony was not hearsay, because they were not asking Lagina what she said during the calls. (*Id.* at Ex. A. Tr. 323:20-25.) Instead, Plaintiffs argued that they were soliciting her "purpose" for making the calls. (*Id.*) The Court responded that as long as Lagina's testimony did not go "into the substance of the calls," it would not be barred by Motion in Limine No. 8. (*Id.* at Ex. A. Tr. 324:1-3.)

During her direct examination, Lagina was asked about the calls she made on her cell phone. (*Id.* at Ex. A. Tr. 382-384.) Specifically, for each call Plaintiffs' counsel asked: (1) who she called, and (2) why she called that person. (*Id.*) Defendants' argue that "[a]llowing Lagina to testify as to her purpose for making the calls essentially allowed her to testify to the substance of the calls," and therefore "Plaintiffs were allowed to bring in inadmissible evidence which was self-serving and prejudicial." (*Id.* at 10.) However, in order for a statement to be barred under the hearsay rule, it must be an out of court statement offered for the truth of the matter asserted. Fed. R. Evid. 801. Lagina's thoughts as to why she used her cell phone are not hearsay because contrary to Defendants' assertion, Lagina did not testify as to what the parties said in any conversation or the substance of the calls. (*See* R. 427, Defs.' Mot. for New Trial, Ex. A. Tr. 382-384.) As such, it was not error to admit Lagina's non-hearsay testimony.

**2. Evidence that Plaintiffs were "shot at"**

Defendants next claim that throughout the trial, "the jury heard repeated references that Plaintiffs were 'shot at' or were crime victims" and that "this evidence was pervasive,

inadmissable based on the Court's prior rulings, and highly prejudicial." (R. 427, Defs.' Mot. for New Trial at 11.) Prior to trial, Defendants filed Motion in Limine No. 7 to bar any reference to any of the claims and conduct complained of in the dismissed counts of Plaintiffs' complaint.[9] (R. 257, Defs.' Motion in Limine No. 7.) The only issue for the jury to decide was whether Plaintiffs were "seized" in violation of the Fourth Amendment on July 24, 2004. Therefore, Defendants argued that "Plaintiffs should be barred from referencing any of the claims or conduct complained of in these counts including allegations of police officers wrongfully firing shots at Plaintiffs, wrongfully firing shots into Carrie and Lagina Warfields' residence, wrongfully pointing their weapons at Plaintiffs . . . ." (*Id.* at 2.) This Court granted the motion in part and denied in part, finding that both sides were barred from arguing or presenting evidence "regarding the propriety of the shooting" of Smith and the use of excessive force against Plaintiffs. (R. 348, Order at 3.) However, the Court found that Defendants' interactions with Plaintiffs prior to their being brought to the police station was in fact probative evidence, as "it sets the scene and puts Plaintiffs' allegations of what occurred at the police station in context." (*Id.*)

Defendants argue that notwithstanding this Court's order, "Plaintiffs intentionally and pervasively interjected the theme that Plaintiffs were shot at in an effort to inflame the jury and engender sympathy." (R. 427, Defs.' Mot. for New Trial at 12.) Contrary to Defendants' assertion, Plaintiffs did not violate Motion in Limine No. 7 by eliciting testimony about the

---

[9] On July 16, 2008, this Court dismissed Plaintiffs' excessive force (Count III) and intentional infliction of emotional distress (Count IV) claims. *Warfield*, 565 F. Supp. 2d 948, 968 (N.D. Ill. 2008). Plaintiffs also voluntarily dismissed their Fourth Amendment (Count V) and intrusion (Count VI) claims. (R. 195-1, Pls.' Opp'n to Summ. J. at 18.)

shooting and that Plaintiffs were "shot at." Although testimony that the police had no justification for shooting Smith would have been barred because it related to "the propriety of shooting," testimony indicating that the shooting transpired was permissible. As this Court noted in our previous opinion, such testimony was important to the jury's understanding of this case, as it "set the scene" of what transpired in the vestibule and why Plaintiffs were questioned by Defendants at the police station. (*See* R. 348, Order at 3.) Accordingly, it was not error to admit this testimony.

**3. Smith's Conviction**

Defendants also claim that the Court erred in denying them the opportunity to elicit testimony that Smith was convicted of attempted murder. (R. 427, Defs.' Mot. for New Trial at 12-13.) This issue was addressed prior to trial in Plaintiffs' Motion in Limine No. 1, which sought to bar testimony regarding Smith's acts and convictions. (R. 268, Pls.' Motion in Limine No. 1.) Similar to the Court's ruling with respect to Defendants' Motion in Limine No. 7, the Court barred both sides from arguing or presenting evidence regarding the propriety of Smith's acts but did not bar evidence about the shooting in its entirety. (R. 348, Order at 5.) The Court determined that such evidence could be probative of other issues in the case. (*Id.*)

Again, the issue before the jury in this case was whether Plaintiffs were seized at the police station. As this Court determined in our previous Order, whether Plaintiffs witnessed a justified or unjustified shooting was outside the scope of the issue for the jury to decide. Therefore, there was no error in denying Defendants the opportunity to elicit testimony that Smith was convicted of attempted murder.

**4. Sgt. Moseley's Testimony**

In their final evidentiary argument, Defendants claim that Sgt. Moseley's testimony was improperly admitted and that Plaintiffs improperly relied on this testimony in their argument. (R. 427, Defs.' Mot. for New Trial at 13.) Over Defendants' objection, the Court allowed Sgt. Moseley to testify as rebuttal to Hillmann's testimony. (*Id.* at Ex. A. Tr. 1497-1500.) The Court ruled that Sgt. Moseley could testify that Detectives are trained to lock witnesses in interview rooms when they are unattended and are also trained to keep witnesses at the police station for as long as possible and not tell them that they have a right to leave. (*Id.* at 1499-1500.)

Defendants claim that "the Court allowed Plaintiffs to argue that the training to which Sgt. Moseley referred applied to all of the Detectives, not just Hillmann" and that this "unduly prejudiced all Defendants." (R. 427, Defs.' Mot. for New Trial at 13.) However, as this Court previously ruled, the scope of the training was an issue that affected the weight of Sgt. Moseley's testimony, not its admissibility. (*Id.* at Ex. A. Tr. 1499.) Sgt. Moseley's limited testimony was directly relevant to the issue of the case and was properly admitted for impeachment purposes. *See Calhoun v. Ramsey*, 408 F.3d 375, 382 (7th Cir. 2005) (impeachment with regard to a matter that "threw light on a material issue in the case" was admissible). Therefore there was nothing "improper" about Sgt. Moseley's testimony.

Accordingly, Defendants' motion for a new trial based on errors in evidentiary rulings is denied.

**C. Errors with respect to Plaintiffs' Closing Argument**

Finally, Defendants argue that they are entitled to a new trial because of Plaintiffs' "prejudicial" comments during closing argument. (R. 427, Defs.' Mot. for New Trial at 13-15.)

The Seventh Circuit, however, has "repeatedly explained" that "improper comments during closing argument rarely rise to the level of reversible error." *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008) (citations omitted); *see also Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 731 (7th Cir. 1999) ("Closing arguments are the time in the trial process when counsel is given the opportunity to discuss more freely the weaknesses in his opponent's case and to highlight the strength of his own."). To constitute reversible error and warrant a new trial, statements made during closing argument must be "plainly unwarranted and clearly injurious." *Id.* at 730.

**1. References to Race**

Defendants first argue that Plaintiffs were "allowed to inject race into the case to inflame the jury." (R. 427, Defs.' Mot. for New Trial at 13.) After a number of Defendants testified that they observed Plaintiffs laughing and joking at certain points during the night, Defendants claim that Plaintiffs improperly argued that this characterization was based on race.[10] (*Id.* at 14.) Defendants argue because there was no evidence presented during trial of any racial animus on the part of Defendants, Plaintiffs' references to race "were made solely for shock value" and "to incite the jury" and thus warrant a new trial. (*Id.*) Plaintiffs, however, claim that they "did not raise the issue of race solely for shock value"; rather, the argument "properly provided the jury with an explanation for why Defendants would lie about Plaintiffs laughing and joking at the police station." (R. 434, Pls.' Resp. at 12.)

---

[10] Specifically, Defendants' point to Plaintiffs' counsel's closing argument, where he said: "The witnesses were supposedly laughing and joking all night. Ladies and gentlemen - - ladies of the jury, to hide their unconscionable misconduct, [] [D]efendants are trying to get you to buy into their stereotypes of [] [P]laintiffs, that just because they're young, they don't have feelings, they don't have emotions. That simply because they're African-American women [] they were laughing and joking through the night." (R. 427, Defs.' Mot. for New Trial, Ex. A. Tr. 1824.)

This Court finds that while the issue of race may have had some inflammatory effect, such remarks did not rise to the level to warrant a new trial. *See Jones*, 188 F.3d at 731 (concluding that even if defense counsel's closing remarks "could have had some negative or inflammatory effect" on the jury's perception of the case, the remarks were not so egregious as to compel a new trial). Moreover, the jury was instructed that statements and arguments presented by counsel were not to be considered evidence. (R. 422, Ct.'s Jury Instructions at 6 ("the lawyers' opening statements and closing arguments to you are not evidence. Their purpose is to discuss the issues and the evidence.").) The Seventh Circuit has instructed that such "curative instructions" to the jury "mitigate harm" and any prejudicial effect of potentially improper remarks made by counsel during closing remarks. *Soltys*, 520 F.3d at 745; *see also Jones*, 188 F.3d at 732. Therefore, Defendants' motion for a new trial is denied on this basis.

**2. Arguments Regarding Deshaun**

Defendants also claim that Plaintiffs "made unfairly prejudicial remarks" regarding Deshaun. (R. 427, Defs.' Mot. for New Trial at 14.) Defendants argue that Plaintiffs improperly referenced Deshaun's deposition when it had not been read or introduced into evidence. (*Id.* at 15.) However, it was Defendants who first referenced Deshaun's deposition. (*See* July 31, 2009 Tr. at 1870:10-14.) In her closing argument, Defendants' counsel stated that "[w]e don't know why" Plaintiffs did not bring Deshaun to testify before the jury given the fact that he had provided deposition testimony about the incident.[11] (*Id.*) Plaintiffs responded by arguing that if

[11] Defendants' counsel also argued that although Deshaun was at the police station earlier in the evening, none of the detectives saw him later in the night. (*Id.* at 1870:15 - 1874:4.) Counsel suggested that it was possible that Lagina had someone come to the station to pick Deshaun up (which would explain her phone calls), while she "willingly" remained at the station. (*Id.*)

Deshaun's testimony was adverse to their case, Defendants could have also called him to testify.[12] Defendants claim that these remarks were improper. (R. 427, Defs.' Mot. for New Trial at 14.) However, once Defendants suggested that Deshaun's missing testimony was adverse to Plaintiffs, it was entirely proper for Plaintiffs to rebut the insinuation by arguing that Defendants could have called Deshaun. *See United States v. King*, 150 F.3d 644, 649 (7th Cir. 1998) ("where the defendant himself has broached the subject of missing witnesses by asking the jury to in a sense penalize the government for its failure to produce the agents," the argument in response was proper). Moreover, it was proper for Plaintiffs to suggest that the jury could draw an adverse inference from Defendants failure to call Deshaun. *Id.* ("To the extent that the prosecutor in this case may also have intimated that the jury could draw an adverse inference from the defendant's failure to call the agents, that too would be proper argument . . . because it was the defense that first broached the subject.") (citations omitted). Therefore, Plaintiffs' closing argument regarding Deshaun was not "plainly unwarranted."[13]

Defendants also argue that it was "highly prejudicial" for Plaintiffs to say that their reason for not calling Deshaun was because of the "grilling" that other Plaintiffs went through on

---

[12] Specifically, Plaintiffs' counsel stated: "Let's talk about Deshaun. You heard Ms. Rosen. He gave a deposition in this case. If he had anything to say other than he was locked in a room with his mother in a room with a mirror all night, [] [D]efendants could have called him, brought him to the stand and had him testify." (R. 427, Defs.' Mot. for New Trial, Ex. A. Tr. 1886:2-6.)

[13] Further, to the extent that Plaintiffs' remarks improperly referenced the "substance" of Deshaun's deposition, the Court finds that this error was not "clearly injurious" to constitute reversible error. *See Jones*, 188 F.3d at 731.

the witness stand.[14] (R. 427, Defs.' Mot. for New Trial at 15.) Defendants, however, did not object to these statements during Plaintiffs' closing argument. (*See Id.* Ex. A. Tr. 1886:10-19.) Accordingly, Defendants argument is waived. *Soltys*, 520 F.3d at 745 (challenges to statements made during closing arguments are waived when the attorney did not object to the statements at the time that they were made). However, even if Defendants' counsel had tendered an appropriate objection, the jury observed Plaintiffs' cross-examination by Defendants' counsel. It was a fair inference for Plaintiffs' counsel to argue that Lagina would not want her 13-year-old son to be subject to this experience. *See id.* ("Attorneys have more leeway in closing arguments to suggest inferences based on the evidence . . . .").

In sum, Defendants have failed to show that the jury's verdict resulted in a miscarriage of justice or that the verdict should be overturned. *See Davis*, 445 F.3d at 979. Therefore, Defendants' motion for a new trial is denied in its entirety.

## II. Motion for Judgment as a Matter of Law

Defendants also move to renew their motion for judgment as a matter of law pursuant to Rule 50(b). (R. 428, Defs.' Mot. for J. as a Matter of Law.) Defendants argue that the verdict should be overturned because no reasonable jury could have found in favor of Plaintiffs. (*Id.* at 3.) Specifically, Defendants claim that no reasonable jury could have found that: (1) Plaintiffs held a reasonable belief that they were not free to leave; (2) any Defendant (or Dismissed

---

[14] In closing argument, Plaintiffs' counsel stated: "You saw the grilling that the plaintiffs went through in this case when they took the witness stand. You saw what - - what happened to them and how unpleasant it was to have to admit that your mother was living in a shelter, have to - - Latoya being cross-examined about the word accurate and having to expose her ignorance not knowing what the word was. It's not a pleasant experience. It's not something that you want a 13-year-old boy to go through, reliving what happened to him when he was eight." (R. 427, Defs.' Mot. for New Trial, Ex. A. Tr. 1886:10-19.)

Defendant) unlawfully detained Plaintiffs; or (3) Schalk or Bogucki acted with malice or reckless disregard to Plaintiffs' constitutional rights.[15] (*Id.*)

## LEGAL STANDARD

Rule 50(b) permits the non-prevailing party to make a renewed motion for judgment as a matter of law. Fed. R. Civ. P. 50(b). In considering such a motion, the Court must determine "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Erickson v. Wis. Dep't of Corr.*, 469 F.3d 600, 601 (7th Cir. 2006) (quoting *Mack v. Great Dane Trailers*, 308 F.3d 776, 780 (7th Cir. 2002)). (internal citations omitted). The Court will not make credibility determinations or re-weigh the evidence presented at trial. *Von Der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 866 (7th Cir. 2009). "A verdict will be set aside as contrary to the manifest weight of the evidence only if no reasonable jury could have rendered the verdict." *Staub v. Proctor Hosp.*, 560 F.3d 647, 658 (7th Cir. 2009) (citation omitted).

## ANALYSIS

Defendants first argue that no reasonable jury could have found that Plaintiffs' constitutional rights were violated. (R. 428, Defs.' Mot. for J. as a Matter of Law at 4-7.) A

[15] Defendants also claim that because no reasonable jury could have found that Plaintiffs were detained, the Certification of Entry of Judgment Against the City (the "Certification") does not apply and no judgment should be entered against the City. (R. 428, Defs.' Mot. for J. as a Matter of Law at 3.) Pursuant to the Certification, the City agreed to accept judgment against it with regard to Plaintiffs' Section 1983 municipal liability allegations if the finder of fact found that one or more of Defendants (including the Dismissed Defendants) violated Plaintiffs' constitutional rights. (*See* R. 385-1, Certification.) The Court finds that the Certification is valid and enforceable.

constitutional violation occurs when a persons' freedom of movement is restrained or they are "seized" in violation of the Fourth Amendment. *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). This occurs "only if, in view of all of the circumstances around the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554. Further, in *Hall v. Bates*, 508 F.3d 854 (7th Cir. 2007), the Seventh Circuit instructs that "[w]hen a suspect does not ask whether he is free to leave" a rebuttable inference arises "that he does not want to terminate the questioning but instead wants to use the opportunity to deflect the suspicion of the police." 508 F.3d at 857; *see also id.* at 858 ("placing on the suspect the burden of ascertaining whether he is in fact detained - - is preferable to speculation by judges or juries on whether the circumstances of the particular interrogation were so intimidating that the average person being questioned would have thought himself under arrest even though he made no effort, as he easily could have done, to determine whether he was").

First, Defendants argue that Plaintiffs did not satisfy their burden under *Hall* because only two Plaintiffs, Jennifer and Latoya, asked anyone if they could go. (R. 437, Defs.' J. as a Matter of Law Reply at 3.) However, in addition to the testimony of Jennifer and Latoya, there was other evidence in the record that efforts were made to determine if Plaintiffs were free to go. (*See* July 14, 2009 Tr. at 561-62 (Dora Wooden asked if they were "all" free to go in earshot of Plaintiffs); July 20, 2009 Tr. at 1644-45 (John Redd's deposition testimony that Plaintiffs said that they were ready to go).) Moreover, Plaintiffs were locked in rooms where they could not get out. (*See, e.g.*, July 6, 2009 Tr. at 191-93 (Carrie banging on door while locked in a room); July 7, 2009 Tr. at 375-76 (Lagina banging on door of room that she and Deshaun were locked inside); July 15, 2009 Tr. at 868 (Mary locked in a room where she was kicking, banging and

saying "let me out"); July 16, 2009 Tr. at 1019-20 (Latoya locked in a room where she was banging, kicking and hollering).) Based on this evidence, it was certainly reasonable for a jury to infer that any alleged failure to explicitly ask whether they were free to leave was because it was clear that they were not free to leave. *See Erickson*, 469 F.3d at 601 (a verdict will not be set aside unless the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is insufficient to support it).[16]

Next, Defendants argue that "[e]ven if a reasonable jury could have found that Plaintiffs held a reasonable belief that they were not free to leave, no reasonable jury could have found that any Defendant [] or Dismissed Defendant was personally liable in any Plaintiffs' unlawful detention." (R. 428, Defs.' Mot. for J. as a Matter of Law at 5.) Defendants argue that Plaintiffs failed to identify the Defendants or Dismissed Defendants that: (1) told them that they had to go to the police station for questioning; (2) told them that they could not leave the station (for those that asked); or (3) would not let them leave the police station after they were questioned. (*Id.* at 6.) Defendants concede that based on the testimony of the Detectives there was "a legally sufficient evidentiary basis" for the jury to conclude which Detective(s) interviewed each particular Plaintiff, but argue that such testimony did not create a reasonable inference that the Detectives were personally responsible for violating Plaintiffs' constitutional rights. (*Id.*)

The fact that Plaintiffs could not specify the particular Detective(s) who harmed them

---

[16] Further, *Hall* involved a situation where a "suspect" was taken to the police station for questioning. *See Hall*, 508 F.3d at 857. It is undisputed that Plaintiffs were never suspects in this case, therefore there could be no inference that they were motivated to cooperate to "deflect the suspicion of the police." *See id.*

does not defeat their claim.[17] *See Miller v. Smith*, 220 F.3d 491 (7th Cir. 2000) (reversing district court's granting of summary judgment because plaintiff could not identify the specific defendant officers who harmed him). In *Miller*, the Seventh Circuit determined that because the plaintiff was able to identify the officers who were present while he was harmed (presumably through police reports and admissions), it was a question for the jury to determine if he was harmed and who was responsible. *Id.* at 495.

Here, the jury found only against the Defendants and Dismissed Defendants that admitting having contact with a particular Plaintiff. (*See, e.g.*, R. 424, Entered Judgment (finding Muzupappa, Kischner, Lymperis, Allen and Pergande were not guilty of violating Jennifer's rights when there was no admission that these detectives had contact with her).) The evidence established that the Defendants and Dismissed Defendants questioned Plaintiffs, controlled their movements, and were responsible for their care while they were at the station. (*See* R. 435, Pls.' J. as a Matter of Law Resp. at 6-13.) Further, Defendants presented no evidence that anyone else interacted with Plaintiffs at the police station. Therefore, in contrast to Defendants' assertion, there was a legally sufficient evidentiary basis for a reasonable jury to find

[17] The Court notes that the trial was five years after the night of the incident. Further, Detective Allen testified that neither he nor the other detectives wore name tags. (*See* July 7, 2009 Tr. at 296.)

that Defendants and Dismissed Defendants unlawfully detained Plaintiffs.[18]

Finally, Defendants argue that no reasonable jury could have found Schalk or Bogucki liable for compensatory or punitive damages. (R. 428, Defs.' Mot. for J. as a Matter of Law at 7.) Defendants claim that even if Schalk and Bogucki "were the ones in charge of the investigation," there can be no liability because "they personally committed no misconduct." (*Id.*) Section 1983 does not allow actions against individuals merely for their supervisory role of others. *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003). To establish liability, a defendant must be shown to have been personally involved in the alleged constitutional violation. *Id.* Although "direct participation is not necessary," there must be at least some showing that a defendant "acquiesced in some demonstrable way in the alleged constitutional violation." *Id.* The personal involvement requirement is satisfied if the conduct causing the violation occurs at the supervisor's "direction or with his knowledge and consent." *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). As such, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.*

The evidence established that Schalk and Bogucki had "overall responsibility for the entire investigation" and that the other Detectives were reporting the results of their investigation

---

[18] Defendants also argue that there was no legally sufficient evidentiary basis to support awards of damages to certain Plaintiffs because they did not establish "actual injury." (R. 428, Defs.' Mot. for J. as a Matter of Law at 10-11, 13.) This argument, however, is not proper under a Rule 50 motion and should have been brought as a motion for remittitur. *See* Fed. R. Civ. P. 50. Nevertheless, Plaintiffs did not have to present physical or medical evidence to receive compensatory damages for their emotional distress. *See, e.g., Tullis v. Towley Eng'g & Mfg. Co., Inc.*, 243 F.3d 1058, 1066-67 (7th Cir. 2001); *Redmond v. Goosherst*, No. 06C61354, 2008 U.S. Dist. LEXIS 61354, at *22-23 (N.D. Ill. Aug. 12, 2008).

to them. (*See, e.g.*, July 14, 2009 Tr. at 664-65; July 17, 2009 Tr. at 1477-80, 1483-84; July 20, 2009 Tr. at 1519, 1702.) Therefore, it was reasonable for the jury to conclude that the alleged violations occurred under their direction or with their knowledge and consent.[19] *See Hildebrandt*, 347 F.3d at1039. As such, Defendants' motion for judgment as a matter of law is denied.

**CONCLUSION**

For the reasons set forth above, Defendants' motions for a new trial (R. 427) and judgment as a matter of law (R. 428) are DENIED.

**Date: January 7, 2010** **ENTERED:**

**Ruben Castillo**
**United States District Judge**

[19] Moreover, both Schalk and Bogucki testified that at 4 a.m. they asked Plaintiffs if they could stay longer and that Plaintiffs agreed. (*See* July 14, 2009 Tr. at 633-34 (Schalk testified that he asked Plaintiffs "if they mind staying a little longer" and "they agreed to stay."); July 20, 2009 Tr. at 1529-30 (Bogucki testified that he and Schalk "pretty much approached [Plaintiffs] and said we know it's been long, but if you could please stay, we'd appreciate it" and "they all agreed to stay.").)